HAROLD D. SAUNDERS *v.* MARYLAND
UNEMPLOYMENT COMPENSATION BOARD

[No. 159, October Term, 1946.]

678

*Decided June 11, 1947.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*William Taft Feldman* and *I. Duke Avnett* for the appellant.

*Aaron A. Baer, Sp. Asst. Atty. General,* with whom was *Hall Hammond, Attorney General,* on the brief for the Maryland Unemployment Compensation Board.

*L. Vernon Miller,* with whom were *Marbury, Miller & Evans* on the brief, for the Bethlehem Steel Co.

MARBURY, C. J., delivered the opinion of the Court.

A claim was filed by the appellant with the Maryland Unemployment Compensation Board for unemployment compensation for the week of February 18th to February 25, 1946. The Board denied his claim. On appeal to the Superior Court of Baltimore City that Court affirmed the action of the Board. From the judgment of the Superior Court the appeal comes here. The appellees are the Board and Bethlehem Steel Company, the employer.

The facts in the case are undisputed. Saunders had been employed by the Bethlehem Steel Company for approximately twenty-six years. He was a member of the United Steel Workers of America. This union called a strike, effective January 21, 1946. On February 16, 1946, an agreement between the employer and the union was entered into, under the terms of which the strike was terminated at 12:01 A. M., February 18, 1946. The unloading of cargo vessels and cars was begun on February 17, 1946, and on February 18th first production operations were started. From that date until February 26, 1946, operations were resumed at periodic stages in accordance with schedules previously prepared by the Company. It was agreed by the Company and the union by a memorandum attached to the agreement of February 16th, that the employees at the respective plants would be returned to work as soon as the ordinary resumption of operations would permit.

The appellant was employed in what is known as B L department, or the job sheeting mill. He reported for work on February 18, 1946, was told there was no work in his plant yet, but to come back on the 20th. He reported on the 20th and was told to report on the 25th. This he did and from that time on worked. His department was one of the last to go into operation. It depended on the resumption of operations in other depart-

ments for material and fuel. Without going into detail, it appears that under the method of operation of the Steel Company, all of the plants could not start at the same time. They were interdependent, and until those engaged in the earlier processes had completed a sufficient amount of products, the later departments would have no material and would have nothing to work with. For that reason the appellant and the other workmen in his situation were unable to start work on the day the strike was ended, but had to wait until operations in the other plants had progressed sufficiently to enable their plant to begin its normal operation.

We are not concerned with any questions between the union or the employer, or any matters involved in the strike itself. The question is whether under the proper interpretation of the Unemployment Compensation Law, Code, Article 95A, workmen who have been on strike are entitled to unemployment compensation for the period immediately following the conclusion of that strike, when, under the circumstances above outlined, their employer has no work for them to do.

Unemployment compensation laws were passed in many, if not all, of the States of the Union following the depression of the early 30's. They were intended to supplement the Federal Social Security Act, 42 U. S. C. A. Sec. 301 *et seq.,* and to provide a cushion against unemployment. There is a certain, if not complete, practical uniformity in these statutes and they are modeled after the English statutes. (10-11 Geo. V-Chapter 30, 25 Geo. V-Ch. 8.) The Maryland Act contains a declaration of public policy which indicates that the Act is a remedial statute to prevent economic insecurity and involuntary unemployment. We have so held. *Maryland Unemployment Compensation Board v. Albrecht,* 183 Md. 87, 36 A. 2d 666. We have also held, as to this statute, that if its language is plain and free of ambiguity and has a definite and sensible meaning, that meaning will be conclusively presumed to be the intent of the Legislature

in enacting the statute. *Celanese Corporation of America v. Davis,* 186 Md. 463, 47 A. 2d 379.

The purpose of the statute was to alleviate the consequences of involuntary unemployment. It was not intended to penalize or subsidize either employees or employers, lawfully engaged in a labor dispute. It was not intended to compel striking workmen to remain without its benefits longer than their own action made necessary. Nor was it intended to compel employers to finance their employees in a strike against them. It was not concerned at all with labor disputes, except in so far as it became necessary to consider them in deciding when unemployment was voluntary and when it was involuntary. And it stated how they should be considered with reference to unemployment in plain, simple and easily understood words.

An individual is disqualified for benefits for the week in which he has left work, voluntarily without good cause, Section 5 (a), for the week he has been discharged for misconduct, Section 5(b), when he has failed without good cause to apply for available, suitable work, or to accept suitable work, when offered, or to return to his customary self-employment, Section 5(c), and "for any week with respect to which the Board finds that his unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed." Section 5(d). This last section is qualified by making it inapplicable to employees who did not participate in the labor dispute. The appellant in the case before us, of course, did participate in the labor dispute and, therefore, the qualifications do not apply to him. The immediate question, therefore, is what does Section 5(d) mean?

Appellant claims this is an exemption from a remedial statute, that it must be strictly construed, and that so construed it disqualifies him only while the strike lasted and does not disqualify him for the period of unemployment following the settlement of the strike. He

cites a number of cases on the general principle that exclusions in remedial statutes should be strictly construed. Without attempting to discuss these cases they are: *Grant Contracting Co. v. Murphy*, 1944, 387 Ill. 137, 56 N. E. 2d 313; *Bliley Electrical Co. v. Unemployment Comp. Bd. of Rev.*, 1946, 158 Pa. Super. 548, 45 A. 2d 898; *MacFarland v. Unemployment Compensation Bd. of Rev.*, 1946, 158 Pa. Super. 418, 45 A. 2d 423; *California Employment Stab. Comm. v. Morris*, Cal. App., 1946, 165 P. 2d 503; *Unemployment Comp. Comm. of Virginia v. Collins*, 1944, 182 Va. 426, 29 S. E. 2d 388; *International Union, etc., v. Industrial Commission*, 1946, 248 Wis. 364, 21 N. W. 2d 711; *Singer Sewing Machine Co. v. New Jersey Unemployment Comp. Comm.*, 1942, 128 N. J. L. 611, 27 A. 2d 889, affirmed 130 N. J. L. 173, 31 A. 2d 818; *Florida Industrial Commission v. Growers Equipment Co.*, 152 Fla. 595, 12 So. 2d 889.

We are in agreement with the general principle of these cases, but we have no right or authority to read into the statute something which is plainly not there. If, therefore, the plain intention is found in Section 5(d) to exclude the appellant from benefits under the circumstances of this case, we cannot give them to him. It is only where there is a doubt as to the meaning of words in a statute that the courts step in to resolve that doubt. Any other attitude on the part of the courts would constitute judicial usurpation of legislative functions.

The appellant contends that the words "stoppage of work" are synonymous with "strike," and that since a strike did not exist because of a labor dispute in the plant during the week from February 18th to February 26th, he was not disqualified for benefits for that week. He cites in support of this contention an Oklahoma case, *Board of Review v. Mid-Continent Petroleum Corporation*, 193 Okla. 36, 141 P. 2d 69, 72. This case held that stoppage of work in a statute similar to the one before us refers to the activities of the workmen and not to the operation of a factory. It said "A strike in the labor sense

is generally defined as a stoppage of work, by common agreement of workingmen. 15 C. J. S., Conspiracy, Sec. 11, p. 1008. That was the definition evidently in the mind of the Legislature; the term 'stoppage of work' was considered as synonymous with 'strike'." It seems to us that the conclusion of the Oklahoma Court does not follow from its premise. A strike may be generally defined as a stoppage of work, but it does not necessarily follow that every stoppage of work is a strike. However, that case is entirely dissimilar from the case we are considering. The claimant, with some 200 employees of the Corporation, went out on a strike. But this did not cause the plant to be shut down. The *claimant* in that case made the contention that "stoppage of work" meant a stoppage of operations and not a stoppage of work by the individual. The Court held against the claimant and said that although the plant was not shut down there was a stoppage of work as to him, which was due to his being on strike and, therefore, he was not entitled to compensation. The question there was whether a striker was entitled to compensation while striking, and the Court, following numerous cited decisions in other jurisdictions held that he was not so entitled. The Court said that the conclusion of the claimant that unless the plant actually stopped operations by reason of the labor dispute, the striker who remained out might receive compensation for unemployment was not supported by the decision of any court of last resort to which its attention had been called. This decision was subsequently overruled by an amendment to the statute made in 1941 by the Oklahoma Legislature, 40 O. S. 1941, Sec. 215(d). The contention of the claimant in that case, as to the meaning of "stoppage of work," was directly opposed to the contention of the claimant in the case before us. But the decision of the court does not uphold appellant's contention here. It only goes so far as to say that a "stoppage of work" does not mean that a whole plant has to be shut down. What it held was that the strike, whether it affected the whole plant

or not, was the cause of the unemployment, and that, therefore, the claimant was not entitled to compensation.

The only other appellate court case cited by appellant is one from the Supreme Court of Illinois. *Walgreen Company v. Murphy*, 386 Ill. 32, 53 N. E. 2d 390. In that case about 320 employees in the wholesale warehouse of a wholesale and retail company went out on strike. They made application for unemployment benefits for the period while they were on strike. The warehouse was practically out of business during the strike, but the retail stores of the company, located elsewhere, continued normal operation. While the court adopted the language of the Oklahoma Court, above quoted, that "stoppage of work" was synonymous with "strike," it held that the case before it showed both a cessation of the operation of the warehouse and a cessation of work. There was stoppage of work due to a labor dispute at the warehouse, and the claims for compensation were denied.

In the case of *Magner v. Kinney*, 141 Neb. 122, 2 N. W. 2d 689, 692, truck drivers employed by a storage and van company and belonging to a striking union, quit their employment when the strike was called. The employer stopped the use of its trucks because it did not want them injured by the strikers, and the claim was made that this caused a lockout rather than a strike. The Court held that it had before it a strike and not a lockout, citing the difference in the following words: "A strike is cessation of work by employees in an effort to get for the employees more desirable terms. A lockout is a cessation of the furnishing of work to employees in an effort to get for the employer more desirable terms." The claim was made by the employees for the period while they were on strike. The court referred to the fact that the unemployment compensation law was a substantial reenactment of the English National Insurance Act and that the construction by the English officials administering that act (no judicial review is pro-

vided) is that "stoppage of work" is a substantial curtailment of work in an establishment and not the cessation of work by the claimant. Applying this definition it said that the labor dispute which operated as a strike occasioned a stoppage of work, and, therefore, the claimants were not entitled to any compensation.

In the case of *Lawrence Baking Company v. Michigan Unemployment Compensation Commission*, 308 Mich. 198, 13 N. W. 2d 260, 264, 154 A. L. R. 660, sixteen union members employed by a wholesale baking company went on strike. Ninety-eight employees did not strike, and the operation of the bakery was interrupted for only about fifteen minutes. The employer hired new workmen, and there was no further interruption or stoppage of work. The striking employees filed claims for unemployment compensation during the period of the strike. The Michigan Act of 1939, Comp. Laws Supp. 1940, Secs. 8485-69, disqualified a workman "for any week with respect to which his total or partial unemployment is due *to a labor dispute which is actively in progress* in the establishment in which he is or was last employed." (Italics supplied.) The 1941 Act, Comp. Laws Supp. 1942, Sec. 8485-69, amended these words, to make them read "for any week with respect to which his total or partial unemployment is due *to a stoppage of work existing because of a labor dispute* in the establishment in which he is or was last employed." (Italics supplied.) The Court held that by the amendment of 1941 the Legislature intended to disqualify an employee for benefits only when his unemployment resulted from a stoppage or substantial curtailment of the work and operations of the employer establishment because of a labor dispute. And it stated "The phrase 'stoppage of work' refers to the work and operations of the employer establishment and not to the work of the individual employee." On that basis the Court permitted the strikers to receive compensation because the employers' work was not stopped.

An earlier Nebraska case, *Deshler Broom Factory v. Kinney,* 140 Neb. 889, 2 N. W. 2d 332, involved claims made by certain employees in a broom factory. Ninety per cent. of those working there quit work at an appointed hour. This resulted in the factory being unable to continue operations. There was some question as to whether the action of the employees was a strike or a lockout, but the Court said this was unimportant because the action of the employees, which was due to a labor dispute, constituted a stoppage of work. The employees, therefore, were not permitted to receive compensation.

All of these decisions are in cases where striking employees ask for compensation for the period in which the strike exists. None of them, like the case before us, has to do with compensation for a period after the strike itself has ended. They are not of compelling authority and are not particularly helpful in the construction of the statute.

Stoppage of work is a fact. The words do not connote any cause for that fact. It may be caused by a strike. It may be caused by a lockout. It may be caused by an Act of God, by the destruction of the place of employment by fire or by flood or in other ways. To say that the words mean a strike would be to import something which cannot be found in the words themselves, something which adds to the fact the cause of that fact. In the case before us the appellant would be greatly benefited by that construction because the work stoppage according to the act must be existing. But we cannot hold that the Legislature, by stating the purpose of the enactment, intended it always to be so construed as to allow benefits to claimants. That intention would, in many cases, (as in the one before us) negative the plain words used.

The exception in the English statutes (1920, 10 and 11, Geo. V, Chap. 30, 8-(1), 1935, 25 Geo. V, Chap. 8, 26-(1)) is practically identical with our statute. It reads "An insured contributor who has lost employment

by reason of a stoppage of work which was due to a trade dispute at the factory, workshop, or other premises at which he was employed shall be disqualified for receiving unemployment benefit so long as the stoppage of work continues, * * *" A practically similar clause is in the 1946 Act. 9 and 10 Geo. VI, Chap. 67, 13-(1). The English Umpires who administer the English statutes, have handed down a number of administrative decisions construing this clause. These decisions are final because there is no provision for judicial review. They are appropriate because it has been held that the contemporaneous construction of the copied statute is intended to be the construction of the copying act. *Lavender v. Rosenheim*, 110 Md. 150, at page 156, 72 A. 669, 132 Am. St. Rep. 420; *Heyn v. Fidelity Trust Co.*, 174 Md. 639, at page 658, 197 A. 292, 1 A. 2d 83, 739. The English Umpires hold that stoppage of work refers primarily not to the cessation of an employee's labor, but to a stoppage of work carried on at the premises, factory or workshop in consequence of the dispute. (Umpire's Decisions, 609, 3809, 4850-1926.) It is not necessary for the purposes of this case to hold that stoppage of work always means stoppage of the employer's operation, although the English decisions are persuasive. The operation was stopped and the work of the claimant was stopped. Under either construction, the claimant is entitled to compensation unless the stoppage is due to a labor dispute. What is a labor dispute within the meaning of the statute is not before us, as all parties agree that a strike such as the one at the Bethlehem plant was a labor dispute.

On the question when the stoppage is due to a labor dispute the English decisions hold "A stoppage is not necessarily limited in its duration by the duration of the dispute. (Umpire's Decisions, 801, 8731.) If the dispute is settled a stoppage due to that dispute ends when there is a general resumption of work. (Umpire's Decisions 4665-1926.) * * * A stoppage may have ended, although the dispute is unsettled, when there has

been a general return to work. (Umpire's Decisions 4665/1926.) Even when the dispute is settled and the parties are willing to resume work, the stoppage may continue when it is not possible to resume work owing to the effects of the stoppage and dispute, *e.g.*, because of the necessity of reheating furnaces and ovens (Umpire's Decisions 1188) ; or explosions of mines, gas, subsidences, floods, etc., in a mine owing to the withdrawal of safety men or other workers (Umpire's Decisions 801, 1022, 1395) ; but the stoppage is not deemed to be protracted beyond the period reasonably sufficient to effect repairs (Umpire's Decisions 1185, 1409-1926, 315-1927). The stoppage due to the dispute ceases when, although all work is not resumed, the non-resumption is due to causes other than the trade dispute which was the original cause of the stoppage * * *." *Halsbury's Laws of England* (2d Ed.) Vol. 34, Pars. 605 & 606, with Notes (k) and (m).

The wording of the Maryland statute is so plain that there seems to be no room for fanciful or theoretical construction. The existing cause must be a labor dispute at the place where the claimant was last employed. It is significant that the Act does not refer 'to a labor dispute "existing" at the place of employment. See *Lawrence Baking Co. v. Michigan Unemployment Compensation Commission, supra.* Thus it appears that the labor dispute may be over as it was in the case before us, but the stoppage of work still may exist because of the aftermath of that labor dispute. It does not seem to us that the Legislature could have intended anything else in view of the words it used. The question presented, therefore, is whether the work stoppage for the week following the strike was the result of that strike or did it result from some other cause.

The appellant contends that inasmuch as he was ready to go back to work at the conclusion of the strike, his unemployment was due to the policy or the method of the Company in arranging its work. It is undeniable the reason the company had no work for appellant was

because of its operation methods. These methods were adopted because, in the opinion of the Company, they produced the best results for its type of production. It is no business of the courts or administrative agencies to determine how a company's business should be conducted. Nor do we understand the appellant to make any criticism of the method used. But because in some other types of business such as the retail mercantile business, or the telephone business, striking employees can go back to work at once after the strike is over, it does not follow, since in other dissimilar types of business such as automobile construction or steel construction, employees cannot go to work at once, that their unemployment is not due to the strike. All businesses are not alike and are not conducted alike. The Legislature must have had this in mind when it enacted the statute. The effect of the strike in one business may be a disruption only while the strike exists, while in others it may mean the disruption for some period thereafter. The business of the Bethlehem Steel Company belongs to the latter class. The Unemployment Compensation Board said "When, as in this case, the immediate resumption of work for all employees is impossible however willing they may be to return to work and the employer to give them employment, the continuing stoppage of work must be held to be due to the original labor dispute. It cannot be argued that there was a lack of work so far as the claimant is concerned, as the lack of work was the result of the work stoppage caused by the labor dispute. As soon, however, as there is a substantial resumption of operations, a work stoppage comes to an end." We are bound by this statement of the facts (supported by evidence) in the absence of fraud (Code, Art. 95A, Sec. 6(h)) and we think it is a correct statement of the applicable law in this particular case.

The appellant makes the further contention that this construction denies him the equal protection of the law and is discriminatory. His position is that steel work-

ers as well as other employees need the benefits of the unemployment compensation act and it is unconstitutional to deny them such benefits where other workers in similar circumstances would receive its benefits. Appellant is, of course, correct, in stating that the 14th Amendment to the Constitution of the United States forbids the denial to him or any other person of the equal protection of the law. We have applied that doctrine in numerous cases. But he ignores the fact that he is not in similar circumstances to workers in other industries. The statute gives to all workers in all industries benefits unless the stoppage of the work is caused by a labor dispute. There is nothing in the fundamental law which can be twisted to say that every labor dispute can only cause so much loss of work, or that the amount of work stoppage due to any labor dispute must be the same as that due to any other labor dispute. Such a construction ignores the facts. The benefits of the law are denied only when the unemployment is due to a labor dispute. Whether it is, or whether it is not, is a question to be determined in each case. The line of demarcation is not the end of the strike but the end of the work stoppage due to the strike. That test is applied to all alike, and there is no discrimination.

Appellant refers us to a case decided in the Circuit Court for Allegany County in 1941 by the entire court of that circuit with Judge Sloan, former Chief Judge of this Court, presiding. This is *Snyder v. Consolidation Coal Company,* reported in the Daily Record, December 5, 1941. In that case there had been a coal strike throughout the country starting on April 1, 1941. On April 21, 1941, the union and the Northern Coal operators came to an agreement, but the Southern Coal operators refused to sign an agreement. The Consolidation Coal Company, with other Maryland operators, were in the Northern section, but they had been allowed a wage differential similar to that allowed the operators in the Southern section. After April 21st, the Consolidation Company kept its mine closed, during a controversy

with the Southern operators to permit it to keep its old wage differential. Claims were filed for unemployment benefits from the date of the original shutdown, April 1, 1941, until the mine was opened. The Court denied benefits up to April 21st when the agreement was made, but said that after that period the reason the mine was shut was because the two groups of operators could not agree on the wage differential. As to this controversy the Court said the miners were bystanders, and that after April 21st there was no labor dispute within the meaning of the Act. This case, while not authoritative, is entitled to weight on account of the distinguished former Chief Judge of this Court who presided, and delivered the opinion. We do not think it is in any way in conflict with our conclusion in the present case. In the *Snyder* case there was an intervening cause with which the strikers had nothing to do. This intervening cause kept the mines closed until some time after the strike was settled. What the Court decided was that the unemployment after April 21st was not due to the strike. The intimation is that had it been due to the strike, benefits would not have been allowed.

For the reasons above stated we conclude that the judgment of the Superior Court should be affirmed.

*Judgment affirmed with costs.*