BALTIMORE TYPOGRAPHICAL UNION NO. 12,
TRUCK DRIVERS AND HELPERS UNION NO.
355 ET AL. *v.* HEARST CORPORATION

[No. 224, September Term, 1966.]

310

Decided April 10, 1967.

The cause was argued before HAMMOND, C. J., and MARBURY, OPPENHEIMER and McWILLIAMS, JJ., and MORTON, J., Associate Judge of the Court of Special Appeals, specially assigned.

*Bernard W. Rubenstein,* with whom was *Jacob J. Edelman* on the brief for Baltimore Typographical Union No. 12 and Truck Drivers & Helpers Union No. 355, part of appellants and by *James N. Phillips, General Counsel for Md. Department of Employment Security,* with whom were *Thomas B. Finan, Attorney General, Bernard S. Melnicove, Special Assistant Attorney General,* and *Peter Sfekas, Assistant General Counsel for Md. Department of Employment Security* on the brief for other appellant.

*James J. Doyle, Jr.,* with whom were *William A. Agee* and *Sherbow, Shea & Doyle* on the brief, for appellee.

MARBURY, J., delivered the opinion of the Court.

Members of the Baltimore Typographical Union No. 12 and of the Truck Drivers and Helpers Local Union No. 355, filed for unemployment compensation because their employer, the Hearst Corporation, Baltimore News-American Division, ceased publication of its newspapers as a result of a work stoppage caused by an alleged labor dispute. The Board of Appeals of the Department of Employment Security of this state ruled that the unemployment was not caused by a work stoppage due to a labor dispute at the premises in which the claimants were last employed and that they were eligible for benefits.

The decision of the Board of Appeals was appealed to the Superior Court of Baltimore City by the Hearst Corporation, and at the same time, a motion was filed to bar the payment of benefits pending final disposition of the case. The motion was overruled; the petition to bar the payment of benefits was dismissed (O'Donnell, J.) ; and benefits were paid. The trial was held on the merits before Judge Cullen, and the decision of the Board of Appeals was reversed on the basis that there was a stoppage of work caused by a labor dispute at the Hearst Corporation's plant in Baltimore. The claimants were denied benefits under Code (1957), Article 95A, Section 6 (e) which disqualified individuals who were unemployed as the result of a work stoppage caused by a labor dispute at the premises at which they were last employed.

This appeal was brought by Baltimore Typographers Union No. 12, Truck Drivers and Helpers Union No. 355, and the Department of Employment Security from the decision of the Superior Court of Baltimore City reversing the Board of Appeals.

The undisputed facts involved in the case were stipulated by the parties and are as follows:

The claimants involved in this case, consisting of members of Baltimore Typographical Union No. 12 and Truck Drivers & Helpers Local Union No. 355, were employed by the Hearst Corporation, Baltimore News American Division.

The Sunpapers and the News-American are daily newspapers of general circulation published in Baltimore, Maryland. The Sun is published by the A. S. Abell Company (hereinafter referred to as Abell) and the News-American is published by the

Hearst Corporation (hereinafter referred to as Hearst). For many years, in addition to unions representing separate groups of employees at each paper, Hearst and Abell have jointly bargained with unions representing certain of their respective employees and have entered into joint collective bargaining contracts with those unions. Two of the six unions with whom they have such joint agreements are Baltimore Typographical Union No. 12 (Local No. 12) and Truck Drivers & Helpers Local Union No. 355 (Local No. 355).

In the contract with Local No. 12, Section 8 provides as follows:

> "Section 8. The language and spirit of this Agreement guarantees the prompt and faithful performance by the Union and the Office of all obligations imposed by the terms of this Agreement. Both parties agree that whenever any differences of opinion as to the rights of either under the Agreement shall arise, or whenever any dispute as to the construction of the contract or any of its provisions takes place, such difference or dispute shall be promptly resolved in the manner provided in this contract without strike, lockout, diminution, or interruption of any kind, to the end that fruitless controversies shall be avoided, good feeling and harmonious relations be maintained, and the prosecution of the business in which the parties have a community of interest shall be assured."

Similarly, the agreement with Local No. 355 contains this clause:

> "Continuous and uninterrupted delivery by the Companies of their newspapers and orderly collective bargaining relations between the Companies and the Union to secure prompt and fair disposition of grievances being an essential consideration for this Agreement, it is agreed that the Union and its members individually and collectively will not, during the term of this Agreement, cause, permit, or take part in any strike, sit-down, picketing or other curtailment or re-

stricting of the delivery of the Companies' newspapers until the procedure hereinafter provided for the settlement of grievances has been exhausted; and the Companies agree not to engage in any lockouts. Should any complaint or grievance arise which cannot be amicably adjusted between the parties hereto within 5 days (this time may be extended by mutual agreement) then such matters shall be submitted to arbitration upon the written request by either party as follows:

"Should any complaint or grievance arise which shall affect one Company (signatory to this Agreement) then the Company shall immediately designate one person, and the Union shall immediately designate one person. The two persons designated shall select a third neutral and impartial person.

"Should any complaint or grievance arise which shall affect both Companies (signatories to this Agreement) then each Company shall immediately designate one person, and the Union shall immediately designate two persons. The four persons designated shall select a fifth neutral and impartial person."

Both provisions are commonly referred to as "no strike" clauses.

Prior to April 17, 1965, Abell was negotiating a collective bargaining agreement with the American Newspaper Guild (the Guild), the bargaining agent for Abell's writers, editors, reporters and other employees with lesser skilled jobs. The Guild does not represent any employees of the News American, whose employees with similar occupations are represented by an independent union. On April 17, 1965, having failed to reach an agreement, the Guild called a strike and placed a picket line around Abell's publishing plant in Baltimore.

After the establishment of the picket line, the Sun continued to publish through April 20, 1965, despite the fact that on each day after pickets appeared, there were a diminishing number of printers (members of Local No. 12) and teamsters (members of Local No. 355) who appeared for work as scheduled. Members of other unions at the Sun continued to appear for

work as scheduled. On April 19, 1965, the printers who did appear for work left early to attend a meeting. At that meeting, the following telegram from the President of the International Typographical Union to the President of Local No. 12 was read to those in attendance:

"Following telegram received today from Stephen Becker, Baltimore Sun Business Mgr.: 'On 2:40 and 3:40 P. M. shifts today only five of 39 men reported. Others were around building but failed to cross Guild picket line. Picket line orderly and well policed. Urge your assistance to have all ITU members honor contracts by reporting for work.' Mr. Becker has been advised that you have been informed of local Union contract responsibilities and that ITU has asked you to make a full and complete report regarding compliance by our members. It is the obligation of each member to fulfill contract requirements. Failure of members to perform work in accordance with the contract cannot be recognized as a lockout under any circumstances. Members should be aware of the dangers of the use of electronic and computer equipment available to set type. It is imperative that every individual member of Baltimore Typographical Union do his part to protect the Union's contract and our Union jurisdiction by performing normal work as required by contract and ITU laws.

"By order of the Executive Council
International Typographical Union"

None of the printers returned to work after the meeting.

Prior to the commencement of the strike, the publisher of the News American posted a notice to all of its employees on April 15, 1965 which reads as follows:

"TO ALL NEWS AMERICAN EMPLOYEES:

"The Washington (D.C.) Newspaper Guild, who is attempting to negotiate an agreement with another newspaper in Baltimore, has issued a bulletin that re-

fers to statements purportedly made by the Publisher and the General Manager of this newspaper.

"The statements attributed to us are completely inaccurate.

"On Tuesday morning, I called a meeting of our Retail, National and Classified Salesmen and told them that we were beginning to receive inquiries from certain advertisers as to whether they could be accommodated in our paper in the event that the Sunpapers were struck.

"I advised our sales staff that in the event of a strike at the Sunpapers, it was the intention of the News American to continue normal operation. However, I further advised them of the fact that a number of Unions, operating in both plants, were working under a single contract jointly signed by both the News American and the Sunpapers; that in the event that any one or more of those Unions who hold jointly-signed contracts fails to report for work on their normal schedules by reason of the fact that they are so instructed by their Union, the News American would consider this a complete breach of contract and would be forced to suspend publication.

"The News American has no part in any negotiations between the Washington (D.C.) Newspaper Guild and the Sunpapers. The Washington (D.C.) Guild holds no contract with the News American. We are, however, very vitally concerned with the performance of any Union with whom we have a good and legal agreement.

"I have every confidence that every Union will live up to its agreement, in which event there will be no interruption in the publication of this newspaper.

Sincerely,
/s/ MARK COLLINS,
Mark Collins,
Publisher".

Having been notified by Abell that it could not publish beyond April 20, 1965 due to the lack of printers and teamsters, the

News American then posted the following notice on April 20, 1965:

"TO OUR EMPLOYEES:

"The Washington Newspaper Guild (Local #35 AFL-CIO) began a strike against the Baltimore Sun on April 17, 1965.

"The Guild began and is now picketing the Sun plant.

"The Sun and the News American have a joint contract (amongst others) with each of the following Unions: Baltimore Typographical Union #12 and Truck Drivers' & Helpers' Local Union #355.

"Sun employees covered by the two enumerated contracts have refused to cross the Guild picket lines and to report for work at the Sun plant.

"The News American deems such refusal a violation of the joint contracts with the Unions above named, and is a threat to the interest of the Sun and News American in bargaining on a group basis.

"Under the circumstances, you are hereby notified that the News American is suspending publication temporarily.

"You are directed not to report for work until further notice after the completion of your present shift.

"Your compensation ceases as of the last shift worked.

"Your employment with this newspaper has not been terminated. The purpose of this notice is to advise you of a period during which there will be no work to be performed by those employees who are not specifically requested to work.

"We regret the result of the Union's actions. However, we hope that this unfortunate strike situation will be terminated in the very near future.

Sincerely,<br>
/s/ W. H. MILLS,<br>
William H. Mills,<br>
General Manager".

Consequently, Hearst closed down after publication of its issue of the News American dated April 21, 1965. At the time it ceased publication, Hearst was not engaged in contract negotiations with any of the unions representing its employees. Nor was there any negotiation in progress between Hearst and any of its employees as to wages, hours or conditions of employment.

Subsequent to the cessation of publication by both papers, Local No. 12 issued emergency travel cards (E cards) which permit a printer to obtain work outside his local's jurisdiction without losing his local seniority or job during a time when he is unemployed due to a strike or lockout. At the same time, members of Local No. 12 began receiving strike benefits from the Union. Thereafter, on May 6, 1965, the President of the International Typographical Union wrote an article which appeared in a union publication entitled "The ITU Review". That article indicated members of Local No. 12, in refusing to cross Guild picket line in contrast to the members of other unions, had failed to meet their contractual obligations and were thus not entitled to benefits afforded members validly on strike. Accordingly, on May 17, 1965, the E cards were ordered withdrawn by the International Union. Thereafter, the Sun printers returned to work and the News American resumed publication on May 27, 1965.

During the time the News American was shut down, several efforts were made to end the impasse. First, on April 21, 1965, Local No. 12 filed charges of unfair labor practices against Hearst with the National Labor Relations Board. Secondly, on April 24, 1965, officials of the News American met with representatives of News American unions and offered to print a paper with a joint masthead or individual issues of both the Sun and the News American at Hearst's plant. Finally, all Sunpaper unions, including Local No. 12 and Local No. 355 met with Abell representatives on May 4, 1965 and suggested the strike would end if the Guild were offered union security. None of these efforts was successful. The N.L.R.B. was not able to give the matter timely consideration, and the offers made in both meetings were rejected. Consequently, the shut-down did not end until May 27, 1965 under the circumstances previously

described. When publication resumed that day, there had been no change in the terms or conditions of employment of Hearst employees, none having been in issue at any time during the period involved.

The statutory provision applicable to this case is Code (1964 Rep. Vol.), Article 95A, Section 6 (e), which provided:

> "*Stoppage of work because of labor disputes.*—For any week with respect to which the Executive Director finds that his unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed, provided that this subsection shall not apply if it is shown to the satisfaction of the Executive Director that—
>
> (1) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and
>
> (2) He does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute; provided, that if in any case separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each such department shall, for the purposes of this subsection, be deemed to be a separate factory, establishment or other premises."

By Laws of Maryland 1966, Chapter 153, page 352, effective June 1, 1966, the legislature amended Section 6 (e) to read, in part, that an individual is not entitled to benefits "for any week with respect to which the Executive Director finds that his unemployment is due to a stoppage of work, *other than a lockout,* * * *." (Emphasis added.) Article 95A, Section 6 (e) (1966 Cum. Supp.).

The first issue to be determined is whether the unemploy-

ment was due to a stoppage of work existing because of a labor dispute at the premises at which claimants were last employed.

There is no doubt that there was a stoppage of work at the Hearst plant. Hearst shut down its plant, suspended publication of its newspaper, and laid off claimants and other employees on April 21, 1965. Stoppage of work may be caused by a lockout. *Saunders v. Unemp. Comp. Board,* 188 Md. 677, 687, 53 A. 2d 579.

The Maryland Unemployment Insurance Law does not define "labor dispute" nor has this Court defined it. The term has been defined by the legislature in Code (1964 Repl. Vol.), Article 100, which deals with work, labor, and employment. Article 100 regulates the hours of work in factories, the employment of minors, etc. and provides conditions and procedures whereby an injunction may be obtained in a labor dispute.[1] Section 74 (c) of that Article defines a "labor dispute" as follows:

> "The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representations of persons in negotiation, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, or concerning employment relations or any other controversy arising out of the respective interests of employer or employee, regardless of whether or not the disputants stand in the proximate relation of employer or employee."

The definition of "labor dispute" found in cases dealing with disqualification for unemployment benefits is very much similar to the one stated above.

---

1. Where the unemployment compensation statute does not define the term "labor dispute," the Court may consider legislative definitions of the term contained in other statutes in existence at the time of the enactment of the Unemployment Compensation Act. Ablondi v. Board of Review, 8 N. J. Super. 71, 73 A. 2d 262 (1950); Spielmann v. Industrial Commission, 236 Wis. 240, 295 N. W. 1 (1940). The pertinent provisions of Art. 100 were first enacted by Laws of Md. 1935, Ch. 574, pp. 1194, 1201, and Art. 95A was first enacted by Laws of Md. 1936, Dec. Sp. Sess., Ch. 1, pp. 3, 8-9.

"The term 'labor dispute' has been defined as any controversy concerning wages, hours, working conditions, or terms of employment, or arising out of the respective interests of employer and employee, and frequently is held, sometimes by reason of express provision, to include any controversy concerning terms, tenure, or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee." 81 C.J.S., *Social Security and Public Welfare,* Section 174, page 262. See cases cited therein.

"Labor dispute" as used in Article 95A, Section 6 (e), included any controversy concerning terms or conditions of employment *or* arising out of the respective interests of employer and employee and included lockouts [2] as well as strikes. See *Ablondi v. Board of Review,* 8 N. J. Super. 71, 73 A. 2d 262, 264 (1950) ; 28 A.L.R. 2d 287, 312 (1953).

Appellants contended that there was no disqualifying labor dispute at the premises where the claimants were last employed because the dispute, if any, was at the premises of the Sunpapers between the Guild and the owners of the Sunpapers and because there were no concessions sought or demands made by appellants at the Hearst plant. For these reasons, appellants concluded that the contract between Hearst and appellants had not been violated directly as to Hearst and that Hearst's interests were not directly involved.

For many years Hearst and Abell bargained jointly with Local No. 355 and Local No. 12, and all contracts were made jointly with both publishers. The contracts in force with these two unions on April 19, 1965, contained no-strike clauses, which prohibited actions leading to the interruption of work. Prior

---

2. A person who is otherwise eligible for benefits is not disqualified if he refuses to accept new work "if the position offered is vacant due directly to a *strike, lockout, or other labor dispute."* (Emphasis added.) (1964 Repl. Vol.), Art. 95A, § 6 (d) (2) (A).

to the commencement of the strike, the publisher of the News American posted an open letter to its employees, notifying them that in the event members of any one or more of those unions which held jointly-signed contracts failed to report for work on their normal schedules, "the News American would consider this a complete breach of contract and would be forced to suspend publication." A letter, posted subsequent to the strike, notified the employees of News American that because Sun employees who were covered by the joint contract refused to cross Guild picket lines, the News American deemed such refusal a violation of the joint contracts and a threat to the interest of the Sun and News American in bargaining on a group basis.

After the lockout, the appellant-unions took steps to protect their members as if a labor dispute was in existence at the Hearst plant. Local No. 12 issued emergency travel cards, and its members were paid strike benefits. Subsequently, the benefits were discontinued and the emergency cards were withdrawn on the orders of the international union because the local union, in refusing to cross the picket lines at the Sun, had failed to meet its contractual obligations. Charges of unfair labor practice against Hearst were filed with the National Labor Relations Board.[3] Appellants refused to return to work if Hearst composed type and ran mats for Abell.

Appellant-unions breached the no-strike provisions of their contracts with Hearst and Abell by refusing to cross the Guild picket lines at the Sun. A voluntary failure or refusal by members of a nonstriking union to pass through a picket line at the place of employment constitutes participation in a labor dispute if there is no justifiable fear of threatened violence. *Mitchell, Inc. v. Md. Emp. Sec. Bd.*, 209 Md. 237, 121 A. 2d 198; *Brown v. Md. Unemp. Comp. Board*, 189 Md. 233, 55 A. 2d 696. There was no evidence of threatened violence.

The breach of the joint contract by the members of the unions

---

3. In determining eligibility for unemployment compensation, the merits of the dispute generally have no bearing on the question whether or not a labor dispute exists. Saunders v. Unemp. Comp. Board, 188 Md. 677, 53 A. 2d 579. See also 81 C.J.S., Social Security and Public Welfare, § 177, p. 265.

directly affected the interests of Hearst. The lockout was utilized as a result of a controversy which arose out of the respective interests of Hearst and the unions. See *New York Mailers' U. Number Six, Inter. Typo. U. v. N.L.R.B.*, 327 F. 2d 292 (2d Cir. 1964).

In *New York Mailers'* two unions sought to set aside an order of the N.L.R.B. dismissing an unfair labor practice complaint against the Publishers' Association of New York City and ten of its members. The Association, on behalf of the publishers it represented, negotiated collective bargaining contracts with nine newspaper craft unions. Several of the contracts contained express no-strike clauses. Collective bargaining on the part of the publishers was brought about by work stoppages over employee grievances. During a series of work stoppages, publishers were forced to shut down their plants for brief periods in compliance with their agreement to do so when one publisher was subjected to a work stoppage.

The Court in affirming the dismissal of the complaint said:

> "Thus, any work stoppage designed to secure resolution of any grievance or contract dispute with any of these publishers was unprotected activity and the struck publisher could have discharged his striking employees without thereby committing an unfair labor practice. * * * In addition to being unprotected activity such stoppages and threats thereof constituted threats to the interest which all of these publishers had in bargaining on a multi-employer basis, and, being such, it was permissible for the publishers to respond by group action. We are not required to say that all employers bargaining as a unit have a legitimate joint interest in maintaining each and every clause of their collective bargaining contract. What we do decide is that such a joint interest may exist in connection with no-strike clauses designed to protect each member of a multi-member bargaining group from a sudden shutdown by a grievance strike.

> "The publishers in this case, as a result of their multi-employer negotiations with the unions represent-

ing their employees, secured a contractual commitment from each union purposed to insure that no publisher would have to suffer a grievance strike during the life of the contracts. In view of the perishability of news as a saleable commodity, the highly integrated nature of a newspaper publishing operation, and the difficulty of combatting work stoppages suddenly called before deadline times, it is not difficult to perceive the importance to the publishers of securing union commitments to substitute the arbitral process for the grievance strike. If honored, the commitments assured the publishers that, at least for the lives of the contracts, no one publisher would be rendered inoperative by a grievance strike while his fellows continued to publish. A decision on the part of a publisher's employees to violate this no-strike commitment, while perhaps prompted by plant circumstances peculiar to that individual publisher, necessarily involved an attack on the protective arrangement set forth in the multi-employer contracts." 327 F. 2d 297-98.

Hearst had an interest in preserving the integrity of the multi-employer bargaining unit and in enforcing promises by the contracting unions not to strike during the life of the agreements. Hearst warned its employees that refusal by the members of the unions, which had bargained with Abell and Hearst as a unit, to cross picket lines at the Sun would constitute a breach of contract. The breach which affected News American's interests having occurred, the members of the offending unions and other employees were locked out. Thereby arose the labor dispute at the Hearst plant. By the threat of a lockout, Hearst demanded compliance by the unions with their contractual promises not to strike. When they failed to comply, they were locked out.

Even though an individual's unemployment was due to a stoppage of work which existed because of a labor dispute at the factory or other premises at which he was last employed, he is not disqualified from receiving benefits if he was not participating in, or financing, or directly interested in the labor dispute

which caused the stoppage of work; and if he did not belong to a grade or class of workers of which there were members employed at the premises at which the stoppage occurred, any of whom were participating in, or financing, or directly interested in the dispute. Article 95A, Section 6 (e) (1) (2). Claimants had the burden of proving that they were not participating in, financing, or directly interested in the labor dispute *and* that they were not members of a grade or class of workers who participated in, financed, or were directly interested in the labor dispute. *Bethlehem Steel Co. v. Board,* 219 Md. 146, 148 A. 2d 403; *Mitchell, Inc. v. Md. Emp. Sec. Bd., Brown v. Md. Unemp. Comp. Board,* both *supra.*

In *Bethlehem Steel,* the Court found that since claimants worked in the same line of production on the same material, were in the same collective-bargaining unit, and were represented by the same local union, they were members of the same grade or class of workers as those who participated in the labor dispute. *Mitchell, Inc.* involved claimants who were employees of an independent contractor working on a job at the plant of a steel company where there was a stoppage of work due to a labor dispute between the company and the C.I.O. After officials of the C.I.O. announced that they would discontinue honoring passes of the workers of the independent contractor, the workers of the independent contractor failed to report to work due to their unwillingness to cross the picket line without passes. The Court held that the claimants had failed to meet their burden to show that they were not participating in the labor dispute. In *Brown* an employer employed men belonging to a C.I.O. union and three separate A.F.L. unions. All of the unions had labor contracts with the employer, but each organization had its own independent bargaining unit. One of the A.F.L. unions, composed of machine shop repairmen, went out on strike; and the next day, when members of the C.I.O., claimants, came to work, they refused to cross the picket lines of the A.F.L. even though there was work available at the plant. The Court held that the stoppage of work for the entire period of approximately three weeks was due to a labor dispute and that by refusing to cross the picket lines when work was available, the claimants became participants in that labor dispute during its entire duration.

Local No. 12 and Local No. 355 were longtime representatives of their respective members in contract negotiations with Abell and Hearst. Members of those unions refused to cross picket lines, and members of those unions employed by Hearst also refused to return to work when Hearst requested them to do so in order to compose type and to run mats at Hearst's plant for Abell. Claimants offered no evidence which would affirmatively show that they were not participants, or renderers of financial aid, or members of the same class or group, some of which participated in or financed the labor dispute.

The final issue to be decided is whether the amendment of Article 95A, Section 6 (e), excluding lockouts from those stoppages of work which exist because of a labor dispute, was to be applied retroactively. Appellants relied entirely on *Janda v. General Motors,* 237 Md. 161, 205 A. 2d 228.

In *Janda* claimants had been denied unemployment benefits for one week in January 1963, because each had received pay in lieu of a vacation under a union contract between his employer and his union. This payment was considered to be wages for benefit purposes under the Maryland Unemployment Insurance Law (Code (1963 Supp.), Article 95A, Section 6 (i) (2)) by the Board of Appeals, which was affirmed by the lower court. Prior to this action, in February 1955, this Court, in *Allen v. Md. Emp. Sec. Board,* 206 Md. 316, 111 A. 2d 645, held that where every eligible employee received a paid vacation which had to be taken under an employer-union contract, such an employee who received vacation pay during a lay off for lack of work was not unemployed for as long a period following the payment as it would have taken to earn customary wages equal to the amount of the payment and, therefore, was not eligible for benefits.

In 1956 the legislature did away with the holding in the *Allen* case. The legislature, by Laws of Maryland 1956, Chapter 95, page 239, added a new disqualification for any week that a claimant received funds equal to or in excess of his weekly benefits in the form of a vacation allowance paid by the employer or received from a special fund set aside for that purpose.

In 1961, because of certain abuses in the unemployment com-

pensation system, the language of the 1956 amendment was repealed and the legislature enacted Laws of Maryland 1961, Chapter 883, page 1602, which excluded from the definition of "wages" the amount of "vacation pay earned or accumulated to the credit of the individual, paid or payable at the time of lay off or separation from employment" and which added a new disqualification for any week that a claimant received funds equal to or in excess of his weekly benefits. This enactment was put to a referendum and did not take effect until December 6, 1962.

In the next session of the legislature another amendment to Section 6 (i), *supra,* was passed, Laws of Maryland 1963, Chapter 729, page 1518, which excluded a vacation allowance from the disqualification, if it was paid by an employer under a union contract in effect as of *December 6, 1962,* if normally the employer did not annually grant its employees time off with pay for vacation. This act took effect June 1, 1963.

This Court, in applying the latest amendment retroactively to afford claimants benefits for one week in January 1963, commented:

> "Many of the reasons that led us to conclude that the Legislature intended in 1961 to make extra pay in lieu of vacation a bar to benefits lead us to conclude that the 1963 act operates to remove that bar where the allowance in lieu of vacation is paid by the employer under and during the term of a written contract in effect on December 6, 1962, and the 'normal practice' of the employer was not to grant a vacation with pay. December 6, 1962, was the day the 1961 act first took effect (it having been in suspended animation since June 1, 1961, its stated effective date, because it had been put to referendum). Prior to that day extra pay in lieu of vacation had not been a bar to benefits. We think the 1963 Legislature, by expressly making December 6, 1962, the critical date, manifested a clear and unmistakable intent that extra pay allowances in lieu of vacation, paid under a contract in force on that day, should continue not to be a disqualification for unemployment benefits so long as the contract then

currently in force continued, whether or not the time of separation from employment came before June 1, 1963, the effective date of the 1963 act. The remedial purposes of the unemployment act to alleviate the menace to the health, morals and welfare of the people of the State would not best be served by the somewhat incongruous result which would follow if the 1963 act was not intended to let vacation allowances in lieu of vacation, paid pursuant to a contract, continue uninterruptedly in the same status. If the 1963 act be not read retrospectively, all claimants paid such allowances under a contract specified in the act would be qualified for benefits only if such allowances were paid before December 6, 1962, or after June 1, 1963, and those paid between the two dates would be disqualified. We do not believe such a result was intended." 237 Md. at 171-72.

The facts in *Janda* are dissimilar to and distinguishable from those in the present case. The legislative history of Laws of Maryland 1966, Chapter 153, page 352, and the language of the statute demonstrate that the legislature intended it to be applied prospectively only. The amendment to Section 6 (e) of Article 95A was passed at the regular session, and it became effective on June 1, 1966. Although several attempts in prior sessions had been made to exclude lockouts from the definition of a stoppage of work, not until the 1966 session was such an attempt successful.

This case arose on May 3, 1965, when the special examiner of the Department of Employment Security denied claimants benefits. On June 25, 1965, the Board of Appeals reversed and awarded benefits. On April 4, 1966, the lower court reversed the Board of Appeals and denied benefits on the ground that claimants were unemployed because of a labor dispute — the lockout. In contrast to the varied history of the statutory provision in the *Janda* case, the history of Section 6 (e) has been relatively constant. In fact, until 1966 its language had not been substantially changed.

The amendment to Section 6 (e) merely added the phrase

"other than a lockout." There is not a specific cut off date as in the amendment involved in the *Janda* case, and the amendatory statute is written in the present tense only: "For any week with respect to which the Executive Director *finds* that his [a claimant's] unemployment *is* due to a stoppage of work, other than a lockout, which *exists* because of a labor dispute * * *." (Emphasis added.) Article 95A, Section 6 (e). Clearly the legislative intention was to apply the statute prospectively only.

Since the rights of these parties are substantive and since the clear intent of the legislature was to apply the statute prospectively only, claimants are not entitled to benefits under the recent amendment. *Warren v. Hardware Dealers,* 244 Md. 471, 224 A. 2d 271; *State Farm v. Hearn, Adm'x,* 242 Md. 575, 219 A. 2d 820.

For the reasons herein stated the judgment of the trial court will be affirmed.

*Judgment affirmed. Costs to be paid by the appellant unions.*