**NATIONAL BROADCASTING CO., INC., Petitioner,**

v.

**DISTRICT UNEMPLOYMENT COMPENSATION BOARD, Respondent.**

No. 11861.

District of Columbia Court of Appeals.

Argued Oct. 11, 1977.

Decided Dec. 12, 1977.

L. Robert Batterman and Allen I. Fagin, New York City, of the bar of the State of New York, pro hac vice, by special leave of the court, with whom Richard M. Gelb, New York City, was on the brief, for petitioner.

Robert J. Hallock, Washington, D. C., with whom Russell L. Carter, Earl S. Vass, and Bill L. Smith, Washington, D. C., were on the brief, for respondent.

Before NEWMAN, Chief Judge, and NEBEKER and FERREN, Associate Judges.

NEBEKER, Associate Judge:

National Broadcasting Company (NBC) seeks review of the decision of the District Unemployment Compensation Board (the

---

7. Memorandum and Order on Defendant's Motion to Reconsider at 5.

Board) that 105 members of Local 31 of the National Association of Broadcast Employees and Technicians (NABET) are entitled to unemployment benefits during the period April—May 23, 1976. NBC contends that the Board erred in failing to hold that the claimants were disqualified from receiving benefits because they were "unemployed . . . as a direct result of a labor dispute . . . ." District of Columbia Unemployment Compensation Act (the Act), § 10(f), D.C.Code 1973, § 46-310(f).[1] We agree.

The relevant facts in this case are not in dispute. NABET and NBC had a three-year, collectively-bargained, nationwide contract which expired on March 31, 1976. Although NABET had, in previous years, continued to work under the terms of expired contracts until a new agreement could be reached, in 1976 it exercised its right to strike NBC at midnight on March 31. Local 31, the Washington unit of the national union, walked off the job. Five days later NABET notified NBC that it was willing for its members to return to work on April 7, 1976, until a new agreement could be reached. NBC responded that it was willing to accept that offer only if NBC and NABET could reach an agreement to prevent the recurrence of alleged sabotage of NBC facilities and to extend the expired contract for a definite term. These conditions were not accepted by NABET, and its members remained off the job until May 23, 1976, when a new agreement was reached.

■ The Board, overruling the claims deputy and appeals examiner, ruled that "the claimants were available for work and are therefore eligible for benefits." Without any consideration of the labor dispute disqualification, upon which the lower deci-

sions had been made, the Board concluded that it was "inequitable" to deny benefits where claimants "were unemployed due to causes utterly beyond their ability to remedy." The simple answer to the Board's rationale is that it applies to initial eligibility under the Act, not to a determination of disqualification once such initial eligibility is established. *Compare* D.C.Code 1973, § 46-309, *with* D.C.Code 1973, § 46-310. *See Doherty v. District of Columbia Unemployment Compensation Board,* D.C.App., 283 A.2d 206 (1971).

There is no assertion that when NABET struck NBC on April 1, 1976, it was not engaged in a labor dispute. The Board, however, asserts that, when NABET offered to return to work and NBC refused to accept the offer unconditionally, NBC was then engaged in a lockout of its employees rather than the employees engaged in a strike of NBC. NBC, on the other hand, argues that a lockout is merely the employer's counterpart of a strike and that unemployment due to a lockout is due to a labor dispute just as is unemployment due to a strike. *See, e. g., Adams v. Industrial Commission,* 490 S.W.2d 77 (Mo.1973); *Baltimore Typographical Union No. 12 v. Hearst Corp.,* 246 Md. 308, 228 A.2d 410 (1967); *In re North River Logging Co.,* 15 Wash.2d 204, 130 P.2d 64 (1942). The Board counters that, were every lockout held to be a part of a labor dispute, an employer could evade the purposes of unemployment compensation statutes merely by denominating a layoff a "lockout." *See Salendius v. Michigan Employment Security Commission,* 33 Mich.App. 228, 189 N.W.2d 764 (1971). Each side argues that the legislative history of the present § 10(f) of the Act supports its views on whether a lockout is a labor dispute.[2] We find, however, that this

---

1. This section contains two *provisos* which prevent disqualification under certain conditions. Neither party argues that either *proviso* is applicable to the facts of the instant situation.

2. The legislative history, in brief, is this: The original legislation disqualified participants in "a strike or jurisdictional labor dispute . . ." Pub.L.No.386, 49 Stat. 946, Aug. 28, 1935. The term "lockout" was included in this provision when the Act was amended in 1943. Pub.L.

No.65, 57 Stat. 100, June 4, 1943. In 1954, the Senate Committee on the District of Columbia reported a bill that would have removed the disqualification for unemployment due to a lockout, S. 3482, 83d Cong., 2d Sess. (1954), but the bill which was passed by both Houses and signed into law deleted "strike" and "jurisdictional labor dispute" as well as "lockout" from the examples of "labor disputes." Pub.L. No.721, 68 Stat. 988, Aug. 31, 1954. The term

history lends no support to either argument. In spite of various attempts to inclusively define the term "labor dispute," its construction has been left to the courts.[3]

We need not decide this issue as posited by the parties in order to decide the instant case. Were we to decide that all lockouts were labor disputes, we would still be required to decide whether, in this and future cases, a particular situation constitutes a lockout rather than a layoff. The resolution of that issue would necessarily depend upon whether the employees were out of work because of a labor dispute (and, therefore, a lockout) or because of conditions not related to the collective bargaining process (and, therefore, a layoff).[4] A decision that all lockouts are labor disputes would serve only to shift our definitional enquiry, not our grounds for decision. Congress has indicated that our construction of this disqualification provision, unlike other provisions,[5] be directed to the term "labor dispute" and we see no reason to shift the focus of inquiry.[6]

 Without generalizing about the status of lockouts, we are convinced that the circumstances of this case constitute a labor dispute within the meaning of § 10(f) of the Act. The claimants are members of a national union which had elected to strike NBC over the terms and conditions of its

employment after March 31, 1976. The immediate focus of that dispute was the terms and conditions of a contract of some definite duration which both parties expected to conclude. When NABET offered to return to work on April 7, it introduced a new element of dispute, *i. e.,* the terms and conditions of employment during the period between the expiration of the old contract and the conclusion of a new one. Yet this element was necessarily a part of the larger dispute—the terms and conditions of employment after March 31. Where, as here, the initial cause of unemployment is a labor dispute, the claimants may not convert that dispute into a situation of involuntary unemployment outside the scope of § 10(f) merely by offering to return to work.

We hold that the claimants were unemployed due to their engagement in a labor dispute and were, therefore, disqualified from receiving unemployment benefits. The order of the Board is

*Reversed.*

---

"labor dispute" was thus left undefined by example.

**3.** Section 10(d)(1)(A) of the Act, on the other hand, permits a claimant to refuse to work where "the position offered is vacant due directly to a strike, lockout, or other labor dispute." We do not regard this definition by example as relevant to our construction of § 10(f), for the two provisions serve different purposes. Section 10(f) disqualifies claimants who voluntarily participate in labor disputes. *See The Washington Post Co. v. District Unemployment Compensation Bd.,* D.C.App., 379 A.2d 694 (1977). Section 10(d)(1)(A), on the other hand, seeks to ensure that claimants are not forced to enter into the labor disputes of others in order to secure benefits. It is reasonable to assume that Congress might more broadly define "labor dispute" in the latter circumstances in order to preclude the loss of benefits by one who is not in a position to assess whether a given situation is, in fact, a "labor dispute."

**4.** A factual situation giving rise to this necessity is not difficult to posit: A collectively-bargained contract has expired. The employees, however, refrain from striking in the expectation that, within a few weeks or months, union and management will conclude a new contract. Every indication is that negotiations are progressing as smoothly as can be expected. Management then closes down without announcing the expected duration of its action. Whether this is a lockout or a layoff necessarily depends on the reason for the closing.

**5.** *See* note 3, *supra.*

**6.** Were we to hold that all lockouts are labor disputes, attempts at defining the term "lockout" for the purposes of § 10(f) might also tend to color construction of that term as it is used in § 10(d)(1)(A), a provision with a different statutory purpose. *See* note 3, *supra.*