522 A.2d 382

**SINAI HOSPITAL OF BALTIMORE, INC.**

v.

**DEPARTMENT OF EMPLOYMENT AND TRAINING, et al.**

No. 109, Sept. Term, 1986.

Court of Appeals of Maryland.

March 23, 1987.

Leonard E. Cohen (Frances E. Kanterman and Frank, Bernstein, Conaway & Goldman, on the brief), Baltimore, for appellant.

Amy S. Scherr, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., on the brief), Baltimore, for part of appellee Dept. of Employment & Training.

Keith Zimmerman (Stephen W. Godoff and Godoff & Zimmerman, on the brief), Baltimore, for other appellee.

Argued before ELDRIDGE, COLE, RODOWSKY, COUCH, McAULIFFE and ADKINS, JJ., and CHARLES E. ORTH, JR., Associate Judge of the Court of Appeals of Maryland (retired), Specially Assigned.

ADKINS, Judge.

We are asked to decide

1. Whether striking workers, permanently replaced during the strike, are disqualified from receiving unemployment compensation benefits under Art. 95A, § 6(a) of the Code on the ground that they have left their employment voluntarily without good cause; and

2. Whether those workers are disqualified under § 6(d) because they refused their employer's offer to return to their pre-strike jobs, although the job offer was made before the workers had filed claims for unemployment compensation.

■ A special examiner of the appellee Department of Employment and Training (DET), that department's Board of Appeals, and the Circuit Court for Baltimore City, all concluded that the workers were not disqualified. We agree and affirm the judgment of the circuit court.

## Facts

On 1 December 1984 the collective bargaining agreement between appellant, Sinai Hospital of Baltimore, Inc. (Sinai), and District 1199E, National Union of Hospital and Health Care Employees, RWDSU, AFL–CIO (the Union), expired

according to its terms. The expiration was preceded by a series of negotiations between Sinai and the Union and also by a 23 November notice from the Union to Sinai that the former intended to call a strike on 4 December. Sinai responded by sending notices to its employee Union members telling them, among other things, that if they honored the call to strike, they could be permanently replaced. Among those to whom this information was sent were the approximately 43 individual appellees (Claimants) who are parties to this appeal.

The strike began on 4 December. The next day Sinai sent mailgrams to all strikers, including the Claimants, advising that their current jobs were available, and requesting them to return to those jobs "immediately." The strikers were warned "[i]f you do not return, you will not be eligible for unemployment benefits under Maryland law." On 7 December Sinai sent notices to the strikers, including the Claimants, that on 11 December it would "begin to hire permanent replacements for strikers who have not returned to work by that date." These notices further explained:

> "A permanent replacement hired to do your job will not be fired to permit you to return to work. You will not be able to use your seniority to bump your replacement, either.

> "If there is a vacant job, you and other strikers will be considered for it, if qualified. If there is no vacant job you can do, you will not be able to return to work at Sinai."

None of the Claimants accepted this invitation. By noon on 11 December all of them were permanently replaced. The strike ended late that same day when the Union ratified a new contract with Sinai. During the brief strike, Sinai continued to operate; there was no "stoppage of work" within the meaning of Art. 95A, § 6(e).

After the termination of the strike, the Claimants, then without jobs, filed for unemployment compensation benefits. Sinai opposed their claims, contending that they had voluntarily quit their jobs, thus producing a disqualification

under § 6(a), and that they had refused an offer of suitable employment, thus producing a disqualification under § 6(d). When those arguments were rejected, first administratively and then judicially, Sinai renewed them here, after we issued a writ of certiorari while the case was pending in the Court of Special Appeals. 307 Md. 754, 517 A.2d 102 (1986).

*Voluntarily Leaving Work—Art. 95A, § 6(a)*

Article 95A, § 6 in pertinent part provides:

"An individual shall be disqualified for benefits:

(a) If the [Secretary [1]] finds that the individual's unemployment is due to his leaving work voluntarily without good cause. Only a cause which is directly attributable to, arising from, or connected with the conditions of employment or actions of the employer may be considered good cause. The individual's disqualification shall be effective for the week in which the unemployment began and shall continue (1) for not less than 4 nor more than 9 weeks immediately thereafter, according to the seriousness of valid circumstances as determined in each case by the [Secretary] or (2) until the individual has become reemployed and has earnings in insured work equal to at least ten times his weekly benefit amount. Leaving work to become self-employed, to accompany or join one's spouse in a new locality, or to attend an educational institution is neither good cause nor a valid circumstance for voluntarily leaving work. Only a substantial cause which is directly attributable to, arising from, or connected with the conditions of employment or actions of the employer, or another cause of such a necessitous or compelling nature that the individual had no reasonable

---

**1.** The text of the statute refers to the "Executive Director" rather than the "Secretary." Art. 95A, § 11(a), however, directs that "[w]herever in this article the word 'Executive Director' appears, it shall be construed to mean the Secretary of Employment and Training." Accordingly, we have substituted "Secretary" for "Executive Director" in quotations from this and other portions of the unemployment compensation statutes.

alternative other than to leave the employment may be considered a valid circumstance...."

Sinai asserts that subsection (a) disqualifies the Claimants because when they did not return to work after being warned they would be permanently replaced (and thus lose their jobs), they voluntarily terminated their employment with the hospital. It argues that the Claimants abandoned their employment by pursuing a course of conduct which resulted in the severance of them from their employment—a constructive voluntary leaving.

Whether the doctrine of constructive voluntary leaving is recognized in Maryland has not been decided by this Court. In *Allen v. Core City Target Y. Program*, 275 Md. 69, 82–83, 338 A.2d 237, 245–246 (1975), we assumed the doctrine might be "applicable under appropriate circumstances" but held that the facts in that case did "not bring it within that doctrine." Nor did we adopt the doctrine in *Md. Emp. Sec. Bd. v. Poorbaugh*, 195 Md. 197, 72 A.2d 753 (1950). There the claimant left his job because he did not like working in cold weather, and failed to return for some four months after the employer had invited him to do so or face loss of his job. We held, under those circumstances, that Poorbaugh had voluntarily left work without good cause. In any event, the facts in both *Allen* and *Poorbaugh* are totally different from those before us here—most notably because neither of those cases involved a labor dispute.

In *Allen*, we concluded that the phrase "due to leaving work voluntarily" has "a plain, definite and sensible meaning, free of ambiguity; it expresses a clear legislative intent that to disqualify a claimant from benefits the evidence must establish that the claimant, by his or her own choice, intentionally, of his or her own free will, terminated the employment." 275 Md. at 79, 338 A.2d at 243. Quoting from Webster's New International Dictionary of the English Language (2d ed. 1974), Black's Law Dictionary (Rev. 4th ed. 1968), and Webster's Seventh New Collegiate Dictio-

nary (1967), respectively, we noted that "voluntary" is defined as:

"1. Proceeding from the will, or from one's own choice or full consent; produced in or by an act of choice.... 2. Unconstrained by interference, unimpelled by another's influence; spontaneous; acting of oneself; free.... 3.a. Done by design or intention; intentional; purposed; intended, not accidental ... b. Made or given of one's own free will...."

\* \* \* \* \* \*

"Done by design or intention, intentional, purposed, intended or not accidental ... intentionally and without coercion."

\* \* \* \* \* \*

"[Done] of one's own free will."

We note that in this case the special referee found as a fact (and this factual finding was accepted by the Board of Appeals) that "at the time the claimants separated from their employment they did not do so with any intention other than to obtain a satisfactory collective bargaining agreement." Indeed, many courts have indicated that a labor dispute does not produce the kind of severance of the employment relationship that is contemplated by the "voluntary leaving" provision of subsection (a). As the Supreme Court of Hawaii reasoned:

"... [T]he terms 'leaving work' or 'left his work' as used in unemployment compensation laws refer only to a severance of the employment relation and do not include a temporary interruption in the performance of services. Kempfer, *Disqualification for Voluntary Leaving and Misconduct*, 55 Yale Law Journal 147, 154. Absence from the job is not a leaving of work where the worker intends merely a temporary interruption in the employment and not a severance of the employment relation. Such is the case of strikers who have temporarily interrupted their employment because of a labor dispute. Under the prevailing view, they have not been deemed to

have terminated the employment relationship and the voluntary leaving disqualification has no application to them."

*Inter-Island Resorts, Ltd. v. Akahane,* 46 Haw. 140, 158, 377 P.2d 715, 725 (1962) (permanently replaced strikers not disqualified from benefits). *See also T.R. Miller Mill Company v. Johns,* 261 Ala. 615, 75 So.2d 675, 680 (1954); *Mark Hopkins, Inc. v. Cal. Emp. Comm.,* 24 Cal.2d 744, 748–749, 151 P.2d 229, 231 (1944); *Coates v. Bingham Mechanical & Metal Products, Inc.,* 96 Idaho 606, 607, 533 P.2d 595, 596 (1975); *Knight-Morley Corp. v. Mich. Emp. Sec. Comm.,* 352 Mich. 331, 336, 89 N.W.2d 541, 544 (1958); *Producer's Produce Co. v. Indust. Comm.,* 365 Mo. 996, 291 S.W.2d 166, 177 (1956); *Penflex, Inc. v. Bryson,* 506 Pa. 274, 287–288, 485 A.2d 359, 365–366 (1984); *Trapeni v. Dept. of Emp. Sec.,* 142 Vt. 317, 324–325, 455 A.2d 329, 333 (1982); *Standard Materials, Inc. v. Admn'r, Div. of Emp. Sec.,* 401 So.2d 400, 401 (La.App.1981); *Tri-State Motor Transit Co. v. Indust. Comm.,* 509 S.W.2d 217, 220 (Mo.App.1974); and *Norris v. Texas Employment Comm.,* 688 S.W.2d 125, 128 (Tex.Ct.App.1985) (all but *Coates, Trapeni,* and *Norris* involving permanently replaced strikers). *But see Baughman v. Jarl Extrusions, Inc.,* 648 S.W.2d 954 (Tenn.App. 1982).

The reasoning of these cases is straightforward. In an economic strike, strikers do not intend to sever the employment relationship; they intend just the opposite. By striking they hope to achieve improvements in pay, benefits, or other working conditions—improvements that will accrue to their advantage when they return to work. As a federal judge put it long ago:

"A strike is cessation of work by employees in an effort to get for the employees more desirable terms. A lock out is a cessation of the furnishing of work to employees in an effort to get for the employer more desirable terms. Neither strike nor lock out completely terminates, when this is its purpose, the relationship between the parties. The employees who remain to take part in the strike or

weather the lock out do so that they may be ready to go to work again on terms to which they shall agree—the employer remaining ready to take them back on terms to which he shall agree. Manifestly, then, pending a strike or a lock out, and as to those who have not finally and in good faith abandoned it, a relationship exists between employer and employee that is neither that of the general relation of employer and employee, nor again that of employer looking among strangers for employees, or employees seeking from strangers employment."

*Iron Molders' Union v. Allis-Chalmers Co.*, 166 F. 45, 52–53 (7th Cir.1908) (Grosscup, J., concurring). *See also* Fierst and Spector, *Unemployment Compensation in Labor Disputes*, 49 Yale L.J., 461, 464 (1940).

■ What is more, a number of courts have concluded or indicated that permanently replaced strikers have in effect been discharged from employment, as opposed to having left work voluntarily. This is so even when the replacement follows a notice like that sent by Sinai in this case. In such circumstances the severance of the employment relationship is the result of an affirmative act by the employer. *See, e.g., Ruberoid Co. v. Cal. Unempl. Ins. App. Bd.*, 59 Cal.2d 73, 27 Cal.Rptr. 878, 378 P.2d 102 (1963); *Marathon Elec. Mfg. Co. v. Indust. Comm.*, 269 Wis. 394, 69 N.W.2d 573 (1955); *Building Products Co. v. Ariz. Dept. of Econ. Sec.*, 124 Ariz. 437, 604 P.2d 1148 (Ariz.Ct.App.1980). *See also Knight-Morley Corp. v. Mich. Em. Sec. Comm.; Producers Produce Co. v. Indust. Comm.; Penflex, Inc. v. Bryson;* and *Tri-State Motor Transit Co. v. Indust. Comm.*, all *supra.* But we need not decide the constructive voluntary leaving issue; that is, whether the special examiner's intent finding was supported by evidence. Nor need we determine whether Sinai's replacement of Claimants was tantamount to their discharge, as the circuit court decided. There is another and more fundamental reason why Claimants are not disqualified under subsection (a). It is that subsections (a) and (e) are mutually exclusive. The examiner and the

Board of Appeals both so held as a matter of law, and we believe they were correct.

Subject to exceptions not applicable here, § 6(e) disqualifies a claimant "[f]or any week with respect to which the [Secretary] finds that his unemployment is due to a stoppage of work, other than a lockout, which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed...." This subsection was before us in *Employment Security Administration v. Browning-Ferris Industries*, 292 Md. 515, 438 A.2d 1356 (1982), in which the specific question presented was the meaning of the phrase "stoppage of work." Browning-Ferris, the employer, contended that "stoppage of work" referred to cessation of productive activity by employees; since its employees were on strike, it thought that a disqualifying stoppage had occurred. We disagreed, holding that "the phrase 'stoppage of work' in § 6(e) refers to the curtailment of the employer's operations." 292 Md. at 524, 438 A.2d at 1362.

We then turned to Browning-Ferris's contention "that § 2 of [Art. 95A] creates a general voluntariness disqualification which is incorporated into § 6(e), and which compels the conclusion that employees who voluntarily stop work to participate in a strike are ineligible for unemployment benefits." [2] *Id.* at 525, 438 A.2d at 1362. In rejecting that

---

2. Section 2 instructs:

"As a guide to the interpretation and application of this article, the public policy of this State is declared to be as follows: Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this State. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family. The achievement of social security requires protection against this greatest hazard of our economic life. This can be provided by encouraging employers to provide more stable unemployment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of

contention, Chief Judge Murphy noted for the Court "that § 2 does not create any general disqualification based on fault." *Id.* *See also MEMCO v. Maryland Employ. Sec. Adm.*, 280 Md. 536, 548, 375 A.2d 1086, 1093 (1977). He explained that "[t]o hold otherwise would require us to pass on the merits of each labor dispute in which the participants sought unemployment benefits—a palpable violation of one of the fundamental tenets of the unemployment compensation law, *i.e.*, that the administering agency remain neutral in labor disputes and refrain from passing on the merits of the dispute." *Browning-Ferris*, 292 Md. at 525–526, 438 A.2d at 1362 [footnote omitted]. Observing that the only labor dispute disqualification mentioned in § 6(e) is the "stoppage of work" requirement, he concluded that "[t]he particular intent of § 6(e), viz., to disqualify claimants only where there is a stoppage of the employer's operations (other than a lockout) must, therefore, control over the general intent of § 2." *Id.* at 526, 438 A.2d at 1363.

Elaborating on this theme, Chief Judge Murphy went on to opine that Browning-Ferris's § 2 argument "would render the 'voluntarily leaving work' provision of § 6(a) superfluous." And he noted that "[t]he consensus of states which have interpreted the 'voluntarily leaving work' and 'labor dispute disqualification' provisions have held that they are mutually exclusive," supporting this statement by quotation from *Inter-Island Resorts v. Akahane*, and citation to numerous other cases. *Browning-Ferris*, 292 Md. at 526–527, 438 A.2d at 1363. The question of whether § 6(a) and § 6(e) are mutually exclusive is now squarely presented to us.

■■■ We are, of course, dealing with a question of legislative intent. We should first attempt to ascertain that

---

poor relief assistance. The legislature, therefore, declared that in its considered judgment the public good and the general welfare of the citizens of this State require the enactment of this measure, under the police powers of the State, for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own."

intent from the statutory language, reading pertinent parts of the legislative language together, giving effect to all of those parts if we can, and rendering no part of the law surplusage. *Md. Port Adm. v. Brawner Contracting Co.,* 303 Md. 44, 492 A.2d 281 (1985); *Management Personnel Serv. v. Sandefur,* 300 Md. 332, 478 A.2d 310 (1984). We may also consider the particular problem or problems the legislature was addressing, and the objectives it sought to attain. *Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 517 A.2d 730 (1986); *Bledsoe v. Bledsoe,* 294 Md. 183, 448 A.2d 353 (1982). And in this regard, we should bear in mind the remedial nature of unemployment compensation, from which flow the principles that such laws should be read liberally in favor of eligibility, and that disqualification provisions are to be strictly construed. *Allen,* 275 Md. at 75, 338 A.2d at 241; *Saunders v. Unemp. Comp. Board,* 188 Md. 677, 53 A.2d 579 (1947).

Subsection (e) does not in express terms preclude the application of subsection (a) when unemployment results from a labor dispute. But its language, and the general structure of § 6, strongly suggest that reading. The section deals with eight bases for disqualification. Three of these have to do with circumstances in which the claimant's economic situation produced by unemployment is at least to some degree alleviated by the receipt of other benefits: receipt of other state or federal unemployment compensation (subsection (f)); receipt of renumeration from pensions (subsection (g)); and receipt of "dismissal payment[s]" (subsection (h)). That is, they operate to disqualify, at least to some extent, when the claimant has some monetary resources available; those subsections have little or nothing to do with the underlying reason for the unemployment.[3] The fourth disqualification, subsection (d), likewise does not concern the reason for the unemployment. It disqualifies if

---

**3.** For purposes of the unemployment insurance law, "[a]n individual shall be deemed 'unemployed' in any week during which he performs no services and with respect to which no wages are payable to him...." Art. 95A, § 20(k)(1).

a claimant fails to seek or accept suitable work. We shall return to subsection (d) later in this opinion. The remaining four disqualifying provisions all relate to the reason for unemployment. They are subsection (a), dealing with voluntarily leaving work, subsections (b) and (c), relating to certain types of discharge by the employer, and subsection (e), the labor dispute provisions. Of these four, subsection (e) is the only one in which the legislature has focused on the labor dispute situation.

Labor disputes, as we have seen, present circumstances that are unusual in terms of unemployment compensation. Unlike the rather standard employer-employee situations considered in subsections (a), (b), and (c) (quitting and discharge), they involve hybrid circumstances in which the usual relationship of employer and employee does not operate in the normal way either factually or legally; the extensive body of federal labor relations law bears witness to this observation. *See generally,* Labor Management Relations Act, 1947, 29 U.S.C. § 141, §§ 151–158, §§ 171–183 (1982); Railway Labor Act, 45 U.S.C. §§ 151–159 (1982). For example, the hiring of replacement workers may be permissible under federal labor law, *Belknap, Inc. v. Hale,* 463 U.S. 491, 103 S.Ct. 3172, 77 L.Ed.2d 798 (1983), but that same law may make it an unfair labor practice not to rehire, under some circumstances, the strikers once the labor dispute has ended. *See NLRB v. Fleetwood Trailer Co. Inc.,* 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967).

We are not concerned here with questions of federal labor law; we refer to it merely to illustrate the complexity inherent in labor disputes, and to note that because of this, it is understandable that the legislature has adopted special provisions to govern unemployment compensation where labor disputes exist. Indeed, other jurisdictions have acknowledged this distinctive feature of the unemployment compensation scheme. "A reading of the disqualification provisions of the Unemployment Compensation Law establishes that the Legislature intended to treat labor activities differently than individual conduct or other concerted activi-

ty." *Penflex*, 506 Pa. at 294, 485 A.2d at 369. "Rather, it must have intended that a person who left work because of a labor dispute be treated differently than one who left for other reasons and without good cause attributable to the employer." *Trapeni*, 142 Vt. at 324, 455 A.2d at 332.

In subsection (e), the General Assembly declared that in general when there is a labor dispute, one participating in it is only disqualified from unemployment compensation benefits when there is a stoppage of work. There was no stoppage of work here, within the meaning of that phrase as we defined it in *Browning-Ferris*.[4] If subsection (a) is to apply in a labor dispute situation, it renders subsection (e) at least partially surplusage, as we indicated in *Browning-Ferris*, 292 Md. at 526, 438 A.2d at 1363. Other courts have reached similar conclusions. *T.R. Miller Mill Co.*, 261 Ala. at 620, 75 So.2d at 679; *Sakrison v. Pierce*, 66 Ariz. 162, 172, 185 P.2d 528, 535 (1947); *Little Rock Furn. Mfg. Co. v. Commr of Labor*, 227 Ark. 288, 298 S.W.2d 56, 58–59 (1957); *Inter-Island Resorts*, 46 Haw. at 156, 377 P.2d at 724; *Intertown Corp. v. App. Bd. Mich. Unemp. CC*, 328 Mich. at 363, 366, 43 N.W.2d 888, 890 (1950); *Trapeni*, 142 Vt. at 323, 455 A.2d at 333.

In short, subsections (a) and (e) are mutually exclusive, as we indicated in *Browning-Ferris*, 292 Md. at 526, 438 A.2d at 1363. This is the legislative intent to be derived from a reading of subsection (e) in conjunction with the other provisions of § 6. Moreover, the determination of mutual exclusivity within § 6 promotes the general remedial design of the unemployment insurance law by strictly construing the disqualifying provisions of § 6 in favor of eligibility. It

---

**4.** Since our 1982 decision in *Browning-Ferris* and through 1985, eight separate legislative bills have been introduced to modify our holding by changing the definition of "stoppage of work" to one less favorable to claimants. None of these bills was passed by the legislature. *See* S.B. 888, General Assembly Sess. (1982); S.B. 317, H.B. 579 and H.B. 581, General Assembly Sess. (1983); H.B. 417 and H.B. 418, General Assembly Sess. (1984); H.B. 557 and H.B. 197, General Assembly Sess. (1985).

also accords with the principle that when a labor dispute exists, those concerned with administration of unemployment compensation should not be concerned with the underlying merits of the dispute. *Browning-Ferris*, 292 Md. at 526, 438 A.2d at 1362; *Saunders*, 188 Md. at 681, 53 A.2d at 580. *See also T.R. Miller Mill Co.*, 261 Ala. at 618, 75 So.2d at 677; *Sakrison*, 66 Ariz. at 165–166, 185 P.2d at 530–531; *Inter-Island Resorts*, 46 Haw. at 157, 377 P.2d at 724; *Intertown*, 328 Mich. at 366, 43 N.W.2d at 890; *Penflex*, 506 Pa. at 287, 485 A.2d at 365. When that principle is applied, it is apparent that an attempt to decide whether a striker, permanently replaced, left work voluntarily necessarily implicates the underlying merits of the dispute.

We hold, then, that when a labor dispute exists, and when, as here, the unemployment in question is the result of that dispute, subsection (a) has no applicability to the determination of qualification for unemployment compensation.

*Failure to Accept Suitable Work—Art. 95A, § 6(d)*

Sinai also asserts that the Claimants are disqualified under § 6(d) which, subject to certain exceptions, disqualifies a claimant who fails "without good cause, either to apply for available, suitable work, when so directed by the [Secretary], or to accept suitable work when offered to him...." Sinai argues that the Claimants were offered suitable work when it invited them to return to their old jobs under threat of permanent replacement. Their failure to accept this invitation, it contends, bars unemployment compensation benefits under subsection (d).

While the Claimants suggest that subsection (d) and (e) are, like (a) and (e), mutually exclusive,[5] both they and DET primarily contend that (d) does not operate here because when Sinai made its "offer" the Claimants were not in

---

**5.** *See Berdych v. Dept. of Emp.*, 69 Md.App. 484, 495–496, 518 A.2d 462, 467–468 (1986) (subsections (a) and (d) of § 6 are not to be read together).

claims status. That is, they had not, at that time, filed claims for unemployment compensation benefits. The Board of Appeals found as a fact that Sinai's "offer" was one of suitable employment, see *Adams v. Cambridge Wire Cloth Co.*, 68 Md.App. 666, 515 A.2d 492 (1986), *cert. denied*, 308 Md. 382, 519 A.2d 1283 (1987) (sustaining administrative fact-finding that request made to strikers to return to work was offer of suitable work), but it also concluded as a matter of law that because the Claimants were not in claims status when that "offer" was made, subsection (d) did not apply to disqualify them. The circuit court agreed, and so do we.

Once again, we return to the structure of Art. 95A. Section 7(b) directs that a claim for benefits "shall be made in accordance with such regulations as the [Secretary] may prescribe." Other portions of § 7 describe a rather complex administrative procedure for handling claims, subject to the judicial review provided by subsection (h). But an early step in the claims procedure is the determination of initial eligibility called for by § 4. That section instructs, *inter alia*, that:

"Any unemployed individual is eligible to receive benefits with respect to any week only if the [Secretary] finds that:

(a) He has registered for work at and thereafter continued to report at an unemployment office in accordance with such regulations as the [Secretary] may prescribe, except that the [Secretary] may, by regulation waive or alter either or both of the requirements of this subsection [in certain cases]. . . .

(b) He has made a claim for benefits with respect to such week in accordance with such regulations as the [Secretary] may prescribe.

(c) He is able to work, and is available for work. . . ."

Thus, the legislative scheme contemplates (1) the filing of a claim and (2) an initial determination of eligibility by the Secretary. It is only after that occurs that issues of disqualification under § 6 can arise, for if the Secretary makes

an initial determination of ineligibility under § 4(a), (b), or (c), there is nothing from which a claimant may be disqualified. If, on the other hand, the Secretary reviews a claim and finds initial eligibility, the question of disqualification does become important. But that cannot occur until a claim has been filed.

Sinai hypothesizes a case in which a claimant files claims in each of several weeks, and then, upon receiving an offer of suitable employment, declines to file a claim in that week, thus avoiding a potential subsection (d) disqualification. We are not persuaded that a claimant could so readily and fraudulently manipulate the system to his or her benefit, and there is no suggestion that this sort of conduct occurred here. Nor are we persuaded by the reasoning of the Arkansas Court of Appeals that "[a] claimant is not allowed to reject suitable employment and still remain eligible for unemployment compensation benefits simply because he has not yet filed a claim for them." *Reynolds Metals Co. v. Couch,* 8 Ark.App. 37, 41, 648 S.W.2d 497, 500 (1983). *See also Dept. of Education v. Atwater,* 417 So.2d 749, 751 (Fla.App.1982) (Florida unemployment scheme " ... does not countenance the imposition of a disqualification on the basis of a claimant's refusal of proffered employment while still gainfully employed ... ").

■ Under Maryland's statutory scheme, the § 6(d) disqualification provision is potentially triggered only after the filing of a claim and an initial determination of eligibility. *See State v. Wheatley,* 192 Md. 44, 48–49, 63 A.2d 644, 646–647 (1948) (determination of eligibility is made at the time of claimant's application for benefits). As the Board of Appeals explained:

"A person's entire history is not on trial in an unemployment claim. No one would conceive of disqualifying a claimant from unemployment benefits during a certain week because he failed to actually look for work during another week, long prior to his ever filing a claim for

benefits. Section 6(d) is another manifestation of the legislature's desire that people claiming unemployment benefits actively look for work in good faith, but it does not mean that a refusal of a job which was offered in the past, during a time when unemployment benefits were not even claimed, should be held against claimants."

■ We believe this is an appropriate reading of legislative intent. The Board has consistently so held. *Flowers v. T.S. Info. Systems, Inc.* (224–BR–83); *Tokar v. Frederick County Board of Educ.* (158–BR–83); *Hirons* (152–BR–83); *Kramp v. Baltimore Gas and Electric Company* (1051–BR–82); *Blake v. Sun Life of America* (1162–BR–81); *De Roo v. Anne Arundel County Board of Educ.* (470–BR–81); *Sipe v. Parsons* (93–BH–81). While the Board's view of law is not binding on us, an agency's expertise in its particular field is entitled to deference. *Balto. Gas & Elec. v. Public Serv. Comm.,* 305 Md. 145, 501 A.2d 1307 (1986); *Valentine v. Board of License Comm'rs,* 291 Md. 523, 435 A.2d 459 (1981). In this case, there is no compelling or urgent reason to depart from the Board's persuasive interpretation. *Smith v. Higinbothom,* 187 Md. 115, 48 A.2d 754 (1946).

■ Moreover, neither the legislature nor any Maryland appellate court has rejected that interpretation; indeed, the long-standing legislative acquiescence gives rise to a strong presumption that the interpretation is correct. *Wash. Sub. San. Comm'n v. Mitchell & Best,* 303 Md. 544, 559, 495 A.2d 30, 37 (1985).

■ Accordingly, we hold that even if Sinai's "offer" was one of suitable work, the Claimants are not disqualified under subsection (d), because they were not in claims status when that "offer" was made.

JUDGMENT AFFIRMED. APPELLANT TO PAY THE COSTS.