657 A.2d 363

Charles A. FACELLO, Alonzo S. Williams, Henry J. Cogdell

v.

**DEPARTMENT OF ECONOMIC AND EMPLOYMENT DEVELOPMENT, et al.**

Nos. 848, 849 and 870, Sept. Term, 1994.

Court of Special Appeals of Maryland.

April 27, 1995.

576

Timothy J. Hogan (Vasiliki P. Szczesny and the Law Offices of Peter G. Angelos, on the brief), for appellants.

Timothy J. McEvoy (G. Stewart Webb, Jr. and Venable, Baetjer and Howard, on the brief), Baltimore, for appellee Bethlehem Steel Corp.

Sheila McDonald Gill, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Lynn M. Weiskittel, Asst. Atty. Gen. and Rachel K. Nunn, Staff Atty., on the brief), Baltimore, for appellee DEED.

Argued before WILNER, C.J., and HOLLANDER and SALMON, JJ.

HOLLANDER, Judge.

Appellants Henry J. Cogdell, Charles A. Facello, and Alonzo S. Williams, who are all former employees of appellee Bethlehem Steel Corporation ("Bethlehem"), elected to retire when Bethlehem closed the particular division in which they worked. Upon retirement, they sought to qualify for unemployment benefits. Appellants' claims were, however, partially denied by the Board of Appeals (the "Board") of the Department of Economic and Employment Development ("DEED"), appellee. At issue is the significance of a single monetary disbursement, called a "Special Payment," made by Bethlehem to each appellant soon after retirement but prior to the commencement of monthly pension payments.

Appellants' unemployment benefits claims were initially considered by various claims examiners and appeals were taken to the Board. After holding a consolidated evidentiary hearing, the Board determined that part of the Special Payment constituted a periodic retirement payment and a portion constituted accrued vacation time. As a result, each appellant was disqualified from receiving unemployment benefits to the extent the Special Payment constituted a periodic retirement payment. In all three cases, appellants appealed the Board's decisions to the Circuit Court for Baltimore City and Bethlehem cross-appealed.

In a well-reasoned opinion, Judge Marvin B. Steinberg affirmed the Board's decision that the Special Payment was, in part, a periodic retirement payment. The court reversed, however, the Board's determination of non-disqualification on the basis of payment for accrued vacation time.

### Questions Presented

The parties present the following two issues for our consideration:

1. "Did the Circuit Court err in affirming the Board's decision and concluding that the special lump sum payment that Appellants received following their layoff was not a lump sum payment within the meaning of § 8–1008(b)(2) of the Labor and Employment Article of the Annotated Code of Maryland."

2. "Did the Circuit Court err in reversing the Board's decision and concluding that the period in which the 'retirement portion' of the special payment would be allocated to reduce weekly unemployment benefits was the thirteen weeks provided for in the Pension Agreement."

For the reasons discussed below, we conclude that the circuit court did not err. Accordingly, we shall affirm.[1]

### Factual Background

The facts are essentially undisputed; the parties presented their evidence below almost entirely by stipulation.

Cogdell, Facello, and Williams were long-time employees at Bethlehem's rod mill in Sparrows Point, Maryland; they had been employed there for 41, 36, and 37 years of service,

---

1. Appellants have not asked us to consider the sufficiency of the Board's findings of fact. Accordingly, we shall only consider the questions of law presented. Md.Code Ann., Lab. & Emp't Art., § 8–512(d); *Adams v. Cambridge Wire Cloth Co.,* 68 Md.App. 666, 673, 515 A.2d 492 (1986), *cert. denied,* 308 Md. 382, 519 A.2d 1283 (1987) (reviewing court must affirm the Board's decision unless its factual findings are unsupported by substantial evidence or the decision is wrong as a matter of law).

respectively. On August 15, 1992, Bethlehem permanently closed its rod mill. In anticipation of the closing, Bethlehem presented the displaced employees with various choices: (1) they could be placed on layoff until a permanent job became available; (2) they could bid on lower paying jobs in the labor pool; or (3) if eligible, they could retire and collect their pension benefits. If an employee chose to retire, the retirement benefits would be paid in accordance with the company's Pension Agreement. Appellants each chose to retire and collect pension benefits, although they also intended to seek other employment elsewhere. Pending re-employment, each appellant sought unemployment benefits pursuant to Md.Code Ann., Lab. & Emp't Art., Title 8 (1992).[2]

Under the terms of Bethlehem's Pension Agreement,[3] an eligible employee who retires is entitled to a "Special Payment," followed by a monthly pension benefit equal to the "regular pension amount." The Pension Agreement defines "Special Payment," in pertinent part, as follows:

> The Special Payment is the payment *for the first three full calendar months following the month in which retirement occurs.* . . . It is a *lump sum equal to 13 weeks of vacation pay* (14 weeks of vacation pay in the case of employees eligible for more than four weeks of regular vacation in the year of retirement), *reduced by any regular vacation pay received for the year of retirement.* . . . Under the basic labor agreement a participant entitled to vacation which he has not taken by the time of retirement does not receive that vacation or vacation pay if he is eligible for the Special Payment, but no deduction will be made from the Special Payment for such vacation.

(Emphasis added).

Once calculated, the Special Payment is payable at any time during the first three months following retirement, but $1,000

---

**2.** Unless otherwise specified, all Code citations herein refer to Lab. & Emp't Art., Title 8 (1992).

**3.** The pension in question was wholly funded by Bethlehem; employees did not contribute to it.

must be made available "as soon as possible" within the first month, and the balance must be made payable "as soon as possible thereafter." The regular pension amount is equal to a percentage (the magnitude depending on the length of service) of the employee's monthly salary rate at the time of retirement, and is payable in monthly installments beginning in the fourth month after retirement.

In September 1992, each appellant received his Special Payment. Cogdell received $9,481, which included four weeks of vacation pay;[4] Facello received $7,662, which included three weeks of vacation pay;[5] and Williams received $7,595, which included three weeks of vacation pay.[6] Also in September 1992, appellants applied for unemployment benefits.

Further facts will be included where pertinent to our discussion of the issues presented.

## *Discussion*

### I. **Procedural Background**

Because of the closing of Bethlehem's rod mill at Sparrow's Point, each appellant would have been entitled to a maximum weekly unemployment benefit of $223, absent the receipt of pension benefits. It is undisputed, however, that appellants were not entitled to unemployment benefits if they also received monthly pension benefits that exceeded the amount of the unemployment benefits. § 8–1008(b).

Appellants began to receive monthly pension benefits soon after December 1, 1992. The parties agree, therefore, that

---

4. Cogdell was entitled to $755 per week of vacation pay and $718 per week of pension benefits. His four weeks of vacation pay equaled $3019 and nine weeks of pension benefits amounted to $6462.

5. Facello was entitled to $683 per week of vacation pay and $624 per week of pension benefits. Three weeks of vacation pay totaled $2048 and nine weeks of pension benefits amounted to $5614.

6. Williams was entitled to $689 per week of vacation pay and $614 per week of pension benefits. His three weeks of vacation pay amounted to $2065 and nine weeks of pension benefits equaled $5530.

appellants were disqualified from receiving unemployment benefits after that date. What is in dispute is the effect of the single monetary sum paid to each appellant prior to the commencement of the monthly pension benefits. The question is whether the Special Payment disqualified the appellants from unemployment benefits during the thirteen-week period preceding commencement of the regular monthly pension benefits.

The provisions of § 8–1008 are central to this case. It states, in pertinent part, as follows:

(a) *"Retirement payment"* defined.—In this section, "retirement payment":

    (1) means an amount in the form of a pension, annuity, or retirement or retired pay from a trust, annuity, profit sharing plan, insurance fund, annuity or insurance contract, or any other similar lump sum or periodic payment that is based on any previous covered employment for a base period employer under a plan paid for wholly or partly by a base period employer; and

    (2) does not include a payment from a state or federal workers' compensation program.

(b) *Effect of payment.*—

    (1) For each week in which the Secretary finds that an individual who otherwise is eligible for benefits receives a retirement payment:

        (i) if the weekly amount of the retirement payment computed under subsection (c) of this section at least equals the individual's weekly benefit amount, the individual is disqualified from receiving benefits for that week; and

        (ii) if the weekly amount of the retirement payment computed under subsection (c) of this section is less than the individual's weekly benefit amount, the individual may receive benefits reduced by the amount of the retirement payment.

    (2) *A retirement benefit in the form of a lump sum payment that an employing unit pays as a result of a layoff*

*or shutdown shall not be deductible from benefits for the period of eligibility.*

\* \* \*

(c) *Computation.*—

    (1) To determine the effect of a retirement payment on eligibility for benefits under subsection (b) of this section:

        (i) if a base period employer paid the full cost of the plan that provides the retirement, the full retirement payment shall be considered; and

        (ii) if a base period employer paid only part of the cost of the plan that provides the retirement payment, 50% of the retirement payment shall be considered.

    (2) To compute the weekly amount of a periodic retirement payment, it shall be prorated on a weekly basis for the period between periodic retirement payments.

    (3) To compute the weekly amount of a lump sum retirement payment, it shall be allocated to the number of weeks that follow the date of separation from employment in accordance with the number of weeks of pay that an individual received at the individual's last wage rate.

(Emphasis added).

As we have pointed out, § 8–1008(b)(2), which is at the heart of this controversy, specifically provides that a "lump sum payment" made as a result of a shutdown will *not* disqualify the employee from receipt of unemployment benefits. COMAR 24.02.02.14(A)(2) defines "lump-sum pension" (but not "lump-sum payment") as "the gross amount of a pension that is paid in one payment. Any pension paid in more than one payment is not a lump-sum pension, even if the installments are paid irregularly." Further, COMAR 24.02.02.14(A)(5) defines "periodic pension payment" as "the gross amount payable on a recurring basis."

The Board held that appellants' retirement benefits were paid "as a result of layoff or shut down," as required by § 8–1008(b)(2), but found that the Special Payment was not a "lump sum payment." Rather, the Board determined that the

Special Payment was merely the first installment of appellants' regular, monthly pension benefits, and pertained to the initial thirteen week period, before the employees would begin receiving monthly pension payments. Accordingly, the Board concluded that the Special Payment did not fall within the ambit of § 8–1008(b)(2), and therefore each appellant was disqualified from receiving unemployment benefits under § 8–1008(b)(1) during the first thirteen weeks of unemployment.

The Board also held, however, that appellants would not be disqualified from receiving unemployment benefits to the extent the Special Payment represented payment for a specified number of weeks of vacation pay. In other words, the Board considered the Special Pay to consist of discrete *weeks* of benefits, rather than the aggregate *value* of the benefits. Accordingly, the Board concluded that each appellant was entitled to unemployment benefits for the particular number of weeks equal to accrued vacation *time,* without regard to the value of the pension benefits in the Special Payment. Specifically, Cogdell would have been entitled to four weeks of unemployment benefits, because his Special Payment included money for four weeks of vacation. Similarly, Facello and Williams each would have been entitled to three weeks of unemployment benefits.

On appeal, the circuit court agreed with the Board that the appellants were receiving their pensions "as a result of layoff or shut down." The court further agreed that the Special Payment constituted the first payment of the pension, representing an advance on the first three months of the monthly pension benefits.

Additionally, the court concurred that appellants were not necessarily disqualified to the extent the Special Payment represented vacation pay. But, upon careful consideration of § 8–1008(c)(2), the circuit court concluded that the Board was required to deduct the *value* of the total vacation pay—rather than the number of weeks of vacation it represented—from the total Special Payment, and then to apply the remainder to the disqualification provisions of § 8–1008. Using Cogdell's

case as an example, the court's analysis would have required the Board to reduce Cogdell's Special Payment of $9481 by $3019 (the total vacation pay) and to reduce the remaining $6462 (nine weeks of regular pension benefits) pro rata over the three month period, to a weekly amount of $497. Using that method in each appellant's case, the pro rated pension portion of the Special Payment was greater than the maximum unemployment insurance benefit available. Consequently, the circuit court concluded that, pursuant to § 8–1008(b)(1)(i), each appellant was entirely disqualified.

## II. "Lump–Sum Payment"

Appellants contend that, based on the definition of the Special Payment in the Pension Agreement and notwithstanding the definition in COMAR, the Special Payment was a "lump sum." Because it was made as a result of a layoff or shutdown, appellants conclude that § 8–1008(b)(2) protects them from disqualification.

Appellees assert two arguments in opposition to appellants' contentions. First, they claim the retirement benefits were not distributed "as a result of layoff or shut down." Second, they contend that, consistent with COMAR and notwithstanding the description of the Special Payment in the Pension Agreement, the Board and the circuit court correctly characterized the Special Payment as part of the periodic payments of regular pension benefits for the purposes of § 8–1008(b)(2).

We agree with the Board, the circuit court, and appellees that the Special Payment was a part of the periodic pension payments.[7] Accordingly, we hold that appellants were disqualified from receiving unemployment benefits during the initial thirteen week period covered by the Special Payment. We explain.

As we have observed, Title 8 of the Labor and Employment Article does not define "lump sum." Moreover, we are not

---

7. Given our decision on this issue, the issue as to whether the retirement benefits were paid "as a result of layoff or shut down" is moot.

aware of any Maryland case that interprets the definition of "lump sum" as it is used in § 8–1008(b). Accordingly, we must determine whether the Special Payment is a lump sum for the purposes of disqualification under § 8–1008(b). In order to do so, we must interpret the meaning of the language used, and in particular, the meaning of the phrase "lump sum."

In *Rose v. Fox Pool Corp.*, 335 Md. 351, 643 A.2d 906 (1994), the Court succinctly summarized the principles of statutory construction that we must now apply.

The cardinal rule of statutory construction is to effectuate and carry out legislative intent. Every statute is enacted to further some underlying goal or purpose—"to advance some interest, to attain some end"—and must be construed in accordance with its general purposes and policies. When called upon to construe a particular statute, we begin our analysis with the statutory language itself since the words of the statute, construed according to their ordinary and natural import, are the primary source and most persuasive evidence of legislative intent. The statute must be construed as a whole so that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.

When the language of a statute is plain and clear and expresses a meaning consistent with the statute's apparent purpose, no further analysis of legislative intent is ordinarily required. As we explained, however, in *Morris v. Prince George's County*, [319 Md. 597, 573 A.2d 1346 (1990)]:

[O]ur endeavor is always to seek out the legislative purpose, the general aim or policy, the ends to be accomplished, the evils to be redressed by a particular enactment. In the conduct of that enterprise, we are not limited to study of the statutory language. The plain meaning rule " 'is not a complete, all-sufficient rule for ascertaining a legislative intention....' " The "meaning of the plainest language" is controlled by the context in which it appears. Thus, we are always free to look at the context within which the statutory language appears.

Even when the words of a statute carry a definite meaning, we are not "precluded from consulting the legislative history as part of the process of determining the legislative purpose or goal" of the law.

[319 Md. at 603–04, 573 A.2d 1346 (citations and footnote omitted in *Rose*)]. The legislative history of a statute, including amendments that were considered and/or enacted as the statute passed through the Legislature, and the statute's relationship to earlier and subsequent legislation are "external manifestations" or "persuasive evidence" of legislative purpose that may be taken into consideration.

335 Md. at 358–60, 643 A.2d 906 (citations omitted). *See also Sinai Hosp. of Baltimore, Inc. v. Dep't of Emp't & Training,* 309 Md. 28, 40, 522 A.2d 382 (1987) (based on remedial principle underlying unemployment insurance laws, "such laws should be read liberally in favor of eligibility, and . . . disqualification provisions are to be strictly construed.").

According to *Black's Law Dictionary,* a "lump-sum payment" is defined as "[a] single payment in contrast to installments; *e.g.* single premium payment for life insurance; a single lump sum divorce settlement; or single worker's compensation payment in lieu of future monthly installment payments." *Black's Law Dictionary* 949 (6th ed. 1991). The problem with appellants' argument is that the initial payment cannot be considered in isolation, as if it were the only payment appellants received. Were we to consider that payment by itself, we would similarly have to consider *each monthly pension payment* in isolation, and deem each one a "lump sum"—an absurd conclusion, particularly given the fact that appellants have conceded that the monthly pension payments are not "lump sums."

Further, the Pension Agreement expressly provides that the Special Payment is "the payment for the first three full calendar months following the month in which retirement occurs." It does not purport to be a distribution of the entire pension benefit, or even a significant fraction of it. Rather, it

is merely an advance on future periodic payments, apparently for the purpose of getting funds quickly to retirees.

Consequently, we are of the view that the Board and the circuit court were correct in viewing the Special Payment in the context of the entire package of pension benefits. They did not err in recognizing that the Special Payment represented no more than an aggregation of the first three monthly installments due under the Pension Agreement.

Our interpretation of the plain meaning of § 8–1008 is further buttressed by a review of the history of the section. Following the enactment of the Federal Unemployment Tax Act (FUTA) under Title IX of the Federal Social Security Act of 1935,[8] unemployment insurance has been a joint federal and state undertaking. *Watkins v. Cantrell*, 736 F.2d 933, 937 (1984). Since then, Congress has generally given states wide latitude in establishing the guidelines and procedures of local programs. *Id.* Nevertheless, pursuant to 26 U.S.C. § 3304(a)(15) (1984), Congress began to require that states limit their programs so that persons receiving periodic pension payments would not "double dip" by also receiving unemployment benefits, except to the extent the latter are greater than the former. *See also Cantrell.* 736 F.2d at 938 (a "fundamental standard" of the statute requires that certain pension benefits be offset against unemployment benefits). Pursuant to the federal requirement, under Md.Ann.Code of 1957, Art. 95A, § 6(g) (1983 & Supp.1987), the predecessor to § 8–1008, a claimant was disqualified "for any week ... he ... received an amount ... equal to or in excess of his weekly benefit amount in the form of a pension ... or any other similar periodic payment...." The section also required that "a lump sum payment of a ... retirement or retired pay shall be allocated...."

In *Taylor v. Dep't of Emp't & Training*, 308 Md. 468, 520 A.2d 379 (1987), the Court considered the language of Art. 95A, § 6(g) in the context of an employee who was premature-

---

**8.** FUTA is presently codified at 26 U.S.C. § 3301 *et seq.* (1988).

ly forced to receive her pension benefits due to a company shut down. Upon receiving her entire pension interest in a lump sum, the employee rolled the money over into a tax-deferred individual retirement account to avoid major tax penalties. Although the employee was forced to "retire" because of company closure, the Court held that the plain meaning of § 6(g) disqualified her from receiving unemployment benefits. 308 Md. at 472–74, 520 A.2d 379. The Court reasoned that the statute made no distinction between employees who were eligible to retire and those ineligible. In so holding, the Court observed:

> That the disqualifying provisions of § 6(g) may, in these circumstances, promote an unwise public policy is not the issue before us. The threshold inquiry in any issue of statutory construction is whether the language is ambiguous or of uncertain meaning. If not, then the Court applies its plain and ordinary meaning.

*Id.* at 472, 520 A.2d 379.

In response to *Taylor*, the Legislature quickly amended Art. 95A, § 6(g) through 1987 Md.Laws Ch. 14. That Act inserted the following language to § 6(g): "In the event that an employer pays a retirement benefit as described in this section due to a layoff or shutdown of operations, the benefit amount shall not be a bar to unemployment insurance benefits for the period of eligibility for unemployment insurance benefits." According to the Maryland Department of Employment and Training, this language is consistent with the federal requirements. "Section 3304 ... does not require ... that the pension amounts be deducted if the individual has not retired from employment." *DET Position Statement In Support of Senate Bill 833*, at 2.

In response to federal concerns,[9] the General Assembly considered an emergency measure the following session to

---

9. In a Position Statement supporting House Bill 267, DEED observed as follows:

States, as a conformity issue ... must deduct from weekly UI benefits any type of *periodic* pension payment under the provisions of [26

clarify § 6(g). Through 1988 Md.Laws Ch. 73, the language previously added was removed, but in the portion concerning the calculation of the weekly rate of the pension benefits, the Legislature added the following language:

> A lump sum payment of a pension ... shall be allocated to a number of weeks following the date of separation according to the number of weeks of pay received at the individual's last pay rate. <u>However, in the event that an employer pays a retirement benefit as described in this subparagraph due to a layoff or shutdown of operations, the benefit amount shall not be deductible from unemployment insurance benefits for the period of eligibility for unemployment insurance benefits.</u>

(New text underlined).

In August 1990, DEED issued proposed regulations that included a definition of "lump sum." 17 Md.Reg. 2008 (Aug. 10, 1990). This definition, now embodied in COMAR 24.02.02.14(A)(2),[10] was adopted on October 19, 1990. 17 Md. Reg. 2531 (Oct. 19, 1990). Since then, the Legislature has amended § 6(g), adding a definition of the term "retirement payment," 1991 Md.Laws Ch. 8, § 2 (also recodifying Art. 65, § 6(g) to § 8–1008), but the Legislature has not attempted to define "lump sum" at any point.

We see nothing inconsistent between COMAR 24.02.02.14(A)(2) ("Any pension paid in more than one pay-

---

U.S.C. §] 3304(a)(15) of the Federal Unemployment Tax Act (FUTA). The U.S. Department of Labor notified this Agency on the last day of the General Assembly Session that the legislation, as enacted with several amendments, was not in conformity with FUTA and required that the Agency provide assurances that State law would be interpreted within the constraints of FUTA....

If the proposed amendment is not enacted, the U.S. Department of Labor will institute conformity proceedings which could result in the loss to the State of approximately $25.2 million in administrative funds and Maryland employers could lose approximately $670 million in federal tax credits.

*DEED Position Statement In Support of House Bill 267,* at 2 (emphasis in original).

**10.** *See* discussion, p. 583, *supra.*

ment is not a lump-sum pension, even if the installments are paid irregularly.") and § 8–1008(b) (*e.g.*, "A retirement benefit in the form of a lump sum payment that an employing unit pays as a result of a layoff or shut down shall not be deductible from benefits for the period of eligibility."), or § 8–1008(c) (*e.g.*, "To compute the weekly amount of a lump sum retirement payment, it shall be allocated to the number of weeks that follow the date of separation from employment in accordance with the number of weeks of pay that an individual received at the individual's last wage rate.").

■ Congress clearly wanted to bar unemployment benefits if the recipient was also receiving a stream of income from a pension. We recognize that "administrative regulation[s] must be consistent with the letter and policy of the statute under which the administrative agency acts." *Ins. Comm'r v. Bankers Indep. Ins. Co.*, 326 Md. 617, 623, 606 A.2d 1072 (1992). But where an agency, using its particular expertise in the laws under which it operates, has interpreted a statute and the legislature has not disturbed the interpretation despite opportunities to do so, "long-standing legislative acquiescence gives rise to a strong presumption that the interpretation is correct." *Sinai Hosp.*, 309 Md. at 46, 522 A.2d 382 (citing *Wash. Sub. San. Comm'n v. Mitchell & Best*, 303 Md. 544, 559, 495 A.2d 30 (1985)). Absent a "compelling or urgent reason to depart from the Board's persuasive interpretation," *Id.*, we shall not do so.

Appellants argue that we should not interpret "lump sum" narrowly, because we would ultimately increase the "costs" to the State and Bethlehem, penalize appellants, and sanction the "unfairness" appellants claim Bethlehem perpetrated upon them. More specifically, appellants claim that, based on the choices Bethlehem offered to them, a worker *could* have chosen to remain on layoff status (receiving full but costly unemployment benefits) and later have elected to retire (receiving pension benefits) any time prior to August, 1994 (the latest that a worker, laid off in September 1992, could elect to retire). Appellants contend that, by construing "lump sum" to

mean total distribution of the entire pension, we would encourage employees, in the future, to engage in such undesirably expensive conduct while punishing appellants for their honest choice. This result, appellants conclude, is contrary to the policy of the unemployment insurance scheme.

■ The Special Payment does not escape § 8–1008(b) merely because the Pension Agreement labels it a lump-sum payment. Both the Board and the circuit court correctly evaluated the Special Payment in light of § 8–1008(b), and we see no error. As in *Taylor*, "[w]e are not unmindful of the policy considerations inherent in the unemployment compensation scheme, but [appellants] mistake[ ] [their] argument." 308 Md. at 472, 520 A.2d 379. Policy considerations are precisely the domain of the legislature; we are confined by the words of the statute. *Id.* at 472–73, 520 A.2d 379.

### III. The Vacation Component [11]

Appellants maintain that, even if the exemption of lump-sum payments in § 8–1008(b)(2) does not apply to the Special Payment, the Board correctly allowed appellants to collect benefits for the number of weeks equal to their accrued vacation time. This argument is equally unavailing.

Whenever a periodic pension payment is not made on a weekly basis, § 8–1008(c)(2) requires the Board to calculate the amount of the periodic pension payment, "prorated on a weekly basis for the period between periodic retirement payments." Thus, a monthly periodic payment would have to be prorated to the number of weeks in that month. This is necessary because § 8–1008(b)(1)(i) disqualifies a claimant from receiving benefits in a given week "if the weekly amount of the retirement payment . . . at least equals the individual's weekly [unemployment insurance] benefit amount. . . ."

The Board held that, to the extent the Special Payment included vacation pay, the vacation component should not be considered to determine if appellants were eligible for unem-

---

11. DEED has not taken a position on this issue.

ployment benefits. The Board reasoned that the "period between periodic retirement payments" mentioned in § 8–1008(c)(2) did not begin until after the vacation portion of the Special Payment had been distributed. Therefore, the Board concluded that, as the Special Payment, by its own terms, covered a period of thirteen weeks, each appellant would not be disqualified by the Special Payment for the number of weeks of earned vacation.

The circuit court examined the language of the Pension Agreement, the Collective Bargaining Agreement, and Maryland law. The court agreed with the Board that, to the extent the Special Payment included compensation for earned, unused vacation time, that portion of the Special Payment would not necessarily disqualify appellants. *See* § 8–1007(a) (employee is disqualified from receiving vacation pay where the employee has been notified of "a definite date on which the individual will return to work;" accordingly, section does not include vacation pay in disqualification when employee is leaving work altogether). Bethlehem does not now contest the finding that appellants' vacation pay should not be included in the disqualification calculation. Rather, Bethlehem focuses on the method of allocation of the vacation component.

No Maryland case has addressed this precise issue of benefit allocation. We agree with the circuit court that nothing in § 81008 or COMAR 24.02.02 supports the Board's decision. To the contrary, § 8–1008(c)(2) is quite specific, in that it requires pro rationing in the computation of "the weekly amount of a periodic *retirement* payment." (Emphasis added). Section 8–1008(c)(2) does not distinguish hybrid periodic payments, which include both pension and non-disqualifiable portions, from periodic *retirement* payments, which are entirely disqualifiable. Instead, it addresses *retirement* payments only.

We hold that the Board correctly excluded the vacation portion of the Special Payment. Moreover, we conclude that the Board should have deducted the amount of vacation pay from the gross value of the Special Payment, and then it

should have pro rated the remaining *pension* portion over the thirteen-week period. Had it done this, it would have concluded readily that appellants were disqualified for the entire thirteen weeks. The circuit court correctly decided so.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**