809 A.2d 696

Sheri May–Dawn HARMON,

v.

STATE of Maryland.

No. 1725, Sept. Term, 1999.

Court of Special Appeals of Maryland.

Oct. 30, 2002.

Margaret L. Lanier, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Cecia Anderson Davis, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore and Leonard Collins, Jr., State's Atty. for Charles County, LaPlata, on the brief), for appellee.

Argued before HOLLANDER, JAMES R. EYLER, and SONNER, JJ.

HOLLANDER, Judge.

In this case, we must examine two sentences imposed upon Sheri May–Dawn Harmon, appellant, by the Circuit Court for Charles County. One was imposed shortly after appellant pleaded guilty to the charge of forgery. The other was imposed a few months later, after appellant had begun to serve the probationary portion of her original sentence.

Appellant was initially sentenced on April 15, 1999, to a term of three years' imprisonment, with all but 90 days suspended, and three years' probation. During the brief period of incarceration, the court agreed to allow appellant to participate in a work release program. While on work release, however, appellant was accused of alcohol consumption, in violation of the program's rules. That violation led the court to hold an evidentiary hearing on July 23, 1999, after appellant had already been released on probation. Following the hearing, the court found appellant in violation of the rules of work release. It then modified the sentence it had previously imposed, changing it to a one-year sentence, to commence almost a year later, on July 4, 2000, with probation upon release.

On appeal, Harmon poses the following six questions on appeal:

I. Did the trial court err in admitting evidence of the breath test, when its admission violated [Maryland Code, Transportation Article] § 16–205.2 and [Mary-

land Code, Courts and Judicial Proceedings Article] CJ § 10–914?

II. Did the court err in finding appellant in violation of her probation, when her probation had not yet begun?

III. Did the court err in imposing some of the back-up time without ever revoking probation?

IV. Did the court err in its sentence, in: 1.) making the sentence begin in the future, 2.) making the beginning date indeterminate?

V. Did the court err in illegally increasing appellant's sentence?

VI. Did the court fail to give appellant adequate notice, since the condition which the court found she violated was not written on the probation order?

We answer the first question in the affirmative, and so shall vacate the circuit court's imposition of the modified sentence on July 23, 1999. Accordingly, we decline to answer appellant's remaining questions.

## FACTUAL SUMMARY

On February 19, 1999, appellant pled guilty to the crime of forgery, for which she was initially sentenced on April 15, 1999. At that sentencing, the court stated:

[Defendant], the sentence is 3 years to the Division of Corrections dating from the 12th of April to give you credit against the sentence for 2 days, not including today, during which you were incarcerated in connection with this matter.

*I am going to suspend all but 90 days of that and place you on probation for a period of 3 years, following your release from serving the 90 days.*

The Probation order reads that you will report to the assigned agent and follow his lawful instructions, work regularly as he directs you, get permission before changing your home address or leave the State.

You will not own, possess, use or have under your control any dangerous weapons or firearms. And obey all laws.

Notify the probation agent at once if arrested for anything. Let him visit your home. Come to court when told to.

You will not illegally possess, use or sell any narcotic drug, controlled dangerous substance or paraphernalia. Pay the court costs as assessed by the clerk through the Probation Department by the first of September and pay the Probation Department's monthly supervision fee. If they require you to do drug testing you cooperate and pay any related cost. I am not ordering them to do it but if they do you cooperate.

You will reimburse the Public Defender for [your lawyer's] services in the amount of $100 through the Probation Department by the first of September.

And during the period of probation you will not set foot on the premises of any commercial establishment in Charles County. That means any place that sells goods and services. It includes doctors offices and movie theaters.

And you will report in person to the local Division of Parole and Probation within 48 hours of your release.

*I am including a work release authorization here,[defendant] and there is a note on the probation order that says that the probation order will commence only if the work release is successfully completed.* As far as I am concerned they can let you out to go to the job interviews and I will make an exception to the prohibition to the commercial establishments in Charles County if you are working there but you don't go to any other if it is not an employer.

*The work release will involve you setting up a schedule with the jail staff and abide by that. You don't make detours coming to or from jail and abide by the rules of occupancy of the jail. You don't come back with any inappropriate chemicals on or in you and cooperate with any effort to police that.*

You don't go home while on a released status and you will pay room and board at the jail that won't exceed $15 a day and that is payable in monthly installments and payable in

full before you are released. In fact they won't let you out until it is paid.

(Emphasis added).

On May 21, 1999, the Charles County Sheriff's Office wrote a memorandum to the trial court, advising that on May 5, 1999, appellant was suspended from the work release program at the detention center because of "positive alcohol readings of .07 and .05." The sheriff's office further advised that, "[u]nless overruled by the courts," appellant would remain suspended.

Thereafter, on June 7, 1999, the court issued an Order indicating that it had been advised that Ms. Harmon had been "excluded from the work release program [at the Charles County Detention Center] for contravention of its rules in that she possessed an alcoholic beverage on May 5, 1999." Therefore, the court said that it "proposes to revoke the probation authorization in this case," and ordered a hearing.

On July 12, 1999, the Clerk issued a notice advising that a hearing was scheduled on July 23, 1999, to "Revoke Probation Authorization." At the outset of the hearing on that date, defense counsel moved to dismiss, asserting numerous grounds. The following transpired:

[DEFENSE ATTORNEY]: I would ... make a motion to dismiss this because Ms. Harmon's probation commenced upon release [from the detention center], according to paragraph one of her order for probation....

THE COURT: That is precisely why the order is worded the way it is. *We realize there is no probation in effect right now and the question is whether it should go into effect.*

[DEFENSE ATTORNEY]: I guess my point was then due to the ambiguity, it ought to—

THE COURT: It is not an ambiguity and there are cases talking about it. So that motion is denied. That is a motion to dismiss.

[DEFENSE ATTORNEY]: Thank you for considering it. I would move to dismiss, Your Honor, though, inasmuch as she did not commit a new crime, only an alleged work release violation and suffered loss of work release and loss of good time credits—

THE COURT: I assume those were administrative sanctions imposed by the jail, not anything the court did. Am I right?

[DEFENSE ATTORNEY]: I think so, Your Honor, but I would argue to reimpose additional jail time now for the same thing would violate double jeopardy principles.

\* \* \*

I would also move to dismiss because the law only authorizes reimposition of sentence for a violation of condition of probation, not for a pre-condition of probation. The law doesn't authorize the court to set that pre-condition to probation commencing, so to give Ms. Harmon any more of her sentence at this point would constitute an illegal increase in her sentence, violating the rule that on[c]e sentence has been imposed, it may not be increased.

\* \* \*

THE COURT: I will tell you this. If you are proven right, I think you are wrong, but if you are proven right, that will be the death nail [sic] to work release in this jurisdiction. How in the world are we going to enforce it? What incentive would a customer have for complying with the rule?

[DEFENSE ATTORNEY]: Certainly, the jail rules, if they don't comply with work release, they lose it, is the incentive to comply.

THE COURT: So the week before he is about to get out, the guy decides the hell with it, I will go out and have a few beers, he has not broken any law, he has simply staggered back into the jail on time, and they revoke the last couple days of his work release. What incentive does a guy have

not to do that unless there is the threat that worse things could happen once the active jail term is over. I grant you, the guy is doing a straight six month jail sentence and there is no split sentence, nothing hanging over his head. I grant you that the only threat is they might keep him in the last couple of days where he otherwise could go to work, I grant you that.

\* \* \*

[DEFENSE ATTORNEY]: Your honor, I would have to respectfully move to dismiss because the court's order of June 7, 1999, does not state any condition or clause of probation that she is charged with violating.

THE COURT: *She is not accused of violating any condition of probation. That is clear. We said that a moment ago.*

[DEFENSE ATTORNEY]: Okay. I guess my authority would be Rule 4–347(a), which says the court needs to do that.

THE COURT: *Even if she had done something prohibited in the probation order, it wouldn't be a probation violation because the probation has never gone into effect.* Your client is agreeing with me on that. She is nodding her head.

[DEFENSE ATTORNEY]: Now, she is on probation.

THE COURT: I am sorry—had not at the time that order was written. You are on probation, now, Maam—I am sorry. *The probation order had not become effective at the time, either the entry of that order or of the event that is the subject of the order complaint.*

[DEFENSE ATTORNEY]: That I sort of make the same argument inasmuch as there is no condition of probation that is for this court to specify she is in violation of pursuant to Rule 4–347(e)2A. Therefore, the case ought to be dismissed, but I will move on.

I would move to dismiss because Ms. Harmon has not been charged with violating the terms of her release. In the absence of committing a new crime—

THE COURT: She hadn't even been released at the time this order was passed.

[DEFENSE ATTORNEY]: That is true.

THE COURT: If she had, I didn't know it.

[DEFENSE ATTORNEY]: My remark was going to tie it in with the *Matthews* and *Savoy* cases. I was going to say, absent her committing a new crime before the probation begins, it doesn't permit her probation to be revoked before it even starts.

\* \* \*

I would move to dismiss, because striking probation authorization is in essence a probation termination per Rule 4–346(b). The incident must occur during the period of probation and she was not on probation at the time of this alleged infraction. Under Rule 4–345, the court cannot increase sentence, and we would just argue again, I think that revoking probation authorization would be illegal.

(Emphasis added).

The court rejected all of appellant's arguments. In sum, the court ruled:

[T]he short answer is there is case law that authorizes a court to revoke a previously entered probation order that has not yet gone into effect but has been entered when the court has learned of new misbehavior and not necessarily rising to the level of criminal on the part of it, or for that matter, new circumstances concerning the defendant's condition which may or may not have existed at the time of the original probation authorization. Some of them maybe not even involving any kind of culpability, may have been circumstances beyond the control of the defendant, which have, again, the cases have sanctioned the revocation or modification of a probation order under those circumstances which resulted in the defendant's being in less comfortable or convenient circumstances than he was originally.

The State then presented the testimony of two correctional officers. Officer David Smith testified that one of his respon-

sibilities was to conduct orientation sessions for new inmates at the detention center, to inform them of the rules regarding work release. He testified that on April 23, 1999, a few days after appellant was sentenced, he advised her of the rules contained in the work release contract. Further, he testified that he gave appellant a copy of the inmate handbook and told her to abide by the general rules and guidelines contained in it.

A piece of paper with appellant's signature, acknowledging receipt of the handbook, was admitted into evidence. In addition, the signed work release contract was received in evidence. Paragraph 10 of the work release contract states: "I agree not to use, possess or introduce into the Work Release Center any weapons, alcoholic beverages, narcotics or drugs (unless under doctor's orders)."

Officer Michael Carista testified that on May 5, 1999, his supervisor escorted appellant from the lobby to the cell block area. Carista explained that his supervisor told him to give appellant a "preliminary breath test" ("PBT"). When he approached appellant, he smelled a light odor of alcohol on her breath. Carista then administered the PBT to appellant.

The State asked Carista to relate the results of the test. At that point, appellant's attorney objected. He argued that, under Md.Code (2001), Transp. Art., § 16–205.2(c), a PBT may not be used by the State in any court action because, unlike the breathalyzer test, it is not yet deemed reliable. Appellant also contended that the results were inadmissible because the State did not timely provide them, in accordance with Md. Code (2001), Cts. & Jud. Proc. Art. ("C.J.") § 10–914. That provision requires the State to furnish certain test information to the defense at least ten days before the hearing. C.J. § 10–914(f)(3). Yet, defense counsel was not provided with a copy of the PBT until the morning of the hearing. The defense attorney argued, in part:

A preliminary breath test is not to be used as evidence by the state in any court action. Any evidence pertaining to a preliminary breath test may not be used in a civil action.

This is according to the Transportation Article 16–205.2(c). That is because it is not deemed reliable enough for use, in a court of law, certainly in one alleging driving while intoxicated, and that is because, Your Honor, it does not meet the scientific standard necessary to render it reliable enough to be admissible in a court of law. Unlike the more formal breathalyzer testing machine, the preliminary breath test hasn't gained general acceptance in the scientific community to warrant reliance on it sufficient enough to make it admissible in a court of law....

The State countered:

We are in the same stance in terms of burden of proof and rules of evidence as in a violation of probation case. We would suggest that the rules are somewhat more relaxed and the court we would feel would be entitled to consider this evidence and give it whatever weight it deemed appropriate.

The court was not persuaded by appellant's contentions. Instead, it allowed the State to offer the disputed testimony.

Detective Carista then stated that the result of the first PBT was .07. He recalled that he repeated the test twenty minutes later and, at that time, the result was .05. According to Carista, appellant told him that she had taken some Nyquil in the parking lot.

Appellant did not testify. Thereafter, the circuit court heard argument as to appellant's motion for judgment of acquittal. The court ruled:

The standard of proof here is by way of analogy to a probation violation proceeding.

The standard is preponderance of the evidence and as regarded here earlier, the evidentiary and procedural mechanisms are relaxed. In this context, as I said to [defense counsel] early on, there was a case here recently where alcohol was detected on a person. A PBT was administered, and it was an .01 or something, and nobody, including the State's Attorney, had any reason to think, much less argue, that what the inmate had consumed was anything

other than the Vicks 44 cold medicine that he or she had on her, which was alleged to have been taken, and I will tell you that I had expected that if it had been a beer or something, the reading might have been a little bit higher and certainly, we are going to resolve doubts in favor of the accused.

In this instance, the PBT clearly would not have been admissible in a lot of other types of proceedings. I am prepared to notice that that device is generally in use in probable cause situations and the like, and is again, its use and acceptance for that purpose is widespread, in general. That was the rationale behind which, on which, I agreed to allow the evidence in. I also attach significance to the officer's testimony that he was familiar with the odor of alcoholic beverages, beer, for example, and he talked about, if you will, regular drunks coming into jail, and in response to the questions from [defense counsel], said he was also familiar with the odor of Nyquil, an over-the-counter cold medicine. I draw the inference that he recognized the distinction between the odors of the two; what he smelled, what he saw, *and the PBT*, persuade me that the respondent, or the defendant, came into jail with alcohol in her system, and that it was something other than Nyquil, simply because, the contract and the rules say that the jail is to be made aware ahead of time of any medication that the inmate has consumed, and they also warn, on page 45, they consider it a violation of work release to use over-the-counter medication with alcohol in it.

(Emphasis added).

The court then found that appellant entered the detention center on May 5, 1999, with unauthorized "alcohol in her system," in violation of the terms of her work release. After the parties addressed the court as to disposition, the court said:

All right. Ms. Harmon, by its nature, a work release sentence is a compromise. It is an effort to reconcile competing interests. The conclusion, whether you agreed with it or not was you needed to go to jail. At the same

time, we didn't want to cause the loss of a job that was available to you and to prevent you from meeting your obligations to others. The happy medium was work release.

\* \* \*

I am going to compromise, again. *I am not going to revoke the probation order.* Ms. Harmon, pay attention. I am not going to revoke it. *I am going to leave it in effect. I am going to modify the sentence though and order into execution one year and one day of the balance effective at 9:00 a.m., on the 4th of July next year, reserving the right to accelerate the date if I hear you violated probation between now and then.* That will allow you to continue with school, allow you to continue with your job. [The defense attorney] will file the reconsideration request and I will grant it and keep you out of jail if you are in compliance with the probation order. If you are not, you go to jail then. Fair enough? Good luck.

## DISCUSSION

Appellant lodges a host of challenges, as reflected in the numerous questions she poses on appeal. In sum, she argues: 1) the court erred in admitting evidence of the PBT at the hearing, because such evidence is not admissible in any court proceeding, and because it was not disclosed by the State in accordance with the discovery rules; 2) the trial court erred in finding her in violation of probation, because the misconduct occurred before her probation had begun; 3) the court made successful completion of work release an illegal precondition to probation; 4) the court erred in imposing some of the "back-up" time without ever revoking probation; 5) the court erred by making the sentence begin in the future, with an indeterminate date; 6) because appellant was not on probation at the relevant time, and because the court did not revoke probation, the court's sentence modification constituted an illegal increase in the sentence; and 7) the court failed to provide appellant with adequate notice of the condition, because it was not written on the probation order. We need not address all

of these issues, however, because we are persuaded by appellant's first contention.

Preliminarily, we observe that the parties repeatedly characterize the hearing below as a probation violation proceeding. For example, appellant asserts that on July 23, 1999, "the court held a violation of probation hearing and found that appellant had violated the terms of her probation." Similarly, the State asserts that, under Rule 5–101(c)(2), the judge did not err in admitting the PBT because the court has discretion as to whether to apply the Maryland Rules of Evidence during a probation violation hearing. It also argues that the "successful completion of the work release program was made an explicit condition of Harmon's probation," and that no error occurred at the "violation of probation hearing" in regard to the admission of the PBT. Further, the State maintains that the court had the authority to revoke probation even before it commenced.

Although the docket entry for July 23, 1999, states that appellant appeared with counsel "for hearing on Revocation Authorization," our review of the Order of July 7, 1999, reveals that the court merely ordered "a hearing on this question. . . ." It did not give a label to the hearing. Moreover, we quoted earlier from the colloquy at the outset of the hearing, which shows that the court realized that appellant was not yet on probation when she allegedly violated the terms of her work release. Further, at the conclusion of the hearing, the court merely *analogized* to a probation violation hearing in discussing the applicable burden of proof. Therefore, it does not appear to us that the court intended to hold a probation violation hearing.

In any event, we are satisfied that we need not ascertain the precise nature of the hearing. For purposes of the first issue raised by appellant, it is sufficient that it was an evidentiary court proceeding of some sort, with significant consequences to appellant. Accordingly, we turn to explore appellant's claim that, under Transp. § 16–205.2, the circuit court erred in

allowing the State to introduce evidence of the PBT at the hearing.

The State responds that, "reading the statute in context, the restriction on the use of preliminary breath tests applies [only] to prosecutions for alcohol and drug-related violations of Maryland's motor vehicle laws." It observes that Ms. Harmon has failed to cite any authority for the proposition that a traffic violation statute applies to a violation of probation hearing. The State adds:

By its own terms, this statute permits police officers who suspect a driver of violating the laws prohibiting driving while under the influence of alcohol to administer preliminary breath tests to 'be used as a guide for the police officer in deciding whether an arrest should be made.' Thus the prohibition against the State's use of the preliminary breath test as evidence applies to prosecutions of violations of the Transportation Article.

We begin our analysis with Transp. § 16–205.2, titled "Preliminary breath test." It provides:

(a) *Request by police officer.*—A police officer who has reasonable grounds to believe that an individual is or has been driving or attempting to drive a motor vehicle while under the influence of alcohol or while impaired by alcohol may, without making an arrest and prior to the issuance of a citation, request the individual to submit to a preliminary breath test to be administered by the officer using a device approved by the State Toxicologist.

(b) *Advice to person to be tested.*—The police officer requesting the preliminary breath test shall advise the person to be tested that neither a refusal to take the test nor the taking of the test shall prevent or require a subsequent chemical test pursuant to section 16–205.1 of this article.

(c) *Use of the results of test.—The results of the preliminary breath test shall be used as a guide for the police officer in deciding whether an arrest should be made and may not be used as evidence by the State in any court*

*action. The results of the preliminary breath test may be used as evidence by a defendant in a court action. The taking of or refusal to submit to a preliminary breath test is not admissible in evidence in any court action. Any evidence pertaining to a preliminary breath test may not be used in a civil action.*

(d) *Refusal to take test not violation of section 16–205.1; test under section 16–205.1 not affected.*—Refusal to submit to a preliminary breath test shall not constitute a violation of section 16–205.1 of this article and the taking of a preliminary breath test shall not relieve the individual of the obligation to take the test required under section 16–205.1 of this article if requested to do so by the police officer.

(Emphasis added).

 As we see it, resolution of this case turns on fundamental principles of statutory construction. In ascertaining the meaning of a statute, we generally begin with the words of the text, giving them their ordinary meaning. *Lewis v. State,* 348 Md. 648, 653, 705 A.2d 1128 (1998); *Gardner v. State,* 344 Md. 642, 647–48, 689 A.2d 610 (1997). If a term or provision is ambiguous, we consider the language "in light of the ... objectives and purpose of the enactment," in order to ascertain the legislative intent. *Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 75, 517 A.2d 730 (1986). In this regard, "we may ... consider the particular problem or problems the legislature was addressing, and the objectives it sought to attain." *Sinai Hosp. of Baltimore, Inc. v. Department of Employment & Training,* 309 Md. 28, 40, 522 A.2d 382 (1987). On the other hand, when the Legislature's intent is evident from the statutory text, and the statute is not ambiguous, we ordinarily "end our inquiry and allow the plain meaning of the statute to govern our interpretation." *Langston v. Langston,* 366 Md. 490, 508, 784 A.2d 1086 (2001). That is the circumstance of this case.

 As we noted, the State maintains that Transp. § 16–205.2 only applies to prosecutions for violations of the transportation article, and thus is not applicable to a probation

violation hearing. We perceive the language of the statute as exceedingly clear, however. Section § 16–205.2 pronounces that a PBT "may *not* be used as evidence by the State in *any* court action." (Emphasis added). No exceptions are embodied in the text, nor is the mandatory language of the text limited to transportation actions. Indeed, the only limitation is that the action must be a court action, which the hearing below surely was. Regardless of its precise nature, it was an evidentiary court proceeding with significant consequences to appellant.

Although hearings concerning probation are sometimes conducted in an informal manner, and the technical rules of evidence may be relaxed, *see State v. Dopkowski,* 325 Md. 671, 680, 602 A.2d 1185 (1992), the absolute language of the statute leaves no doubt as to its applicability. It compels us to conclude that the PBT was not admissible at the hearing.

Having determined that the court erred in admitting the PBT evidence, we must next decide whether the error was harmless. We conclude that it was not.

In *Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976), the Court of Appeals said:

> [W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed 'harmless' and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict.

*Id.* at 659, 350 A.2d 665 (footnote omitted).

Essentially, it is our task to determine whether the "cumulative effect of the properly admitted evidence so outweighs the prejudicial nature of the evidence erroneously admitted that there is no reasonable possibility that the decision of the finder of fact would have been different had the tainted evidence been excluded." *Ross v. State,* 276 Md. 664,

674, 350 A.2d 680 (1976). To be sure, Officer Carista testified that he smelled a slight odor of alcohol on appellant's breath, and he also said that appellant told him she drank some Nyquil in the parking lot of the detention center. But, we cannot overlook the court's comments. At one point during the hearing, the court stated:

... I don't know where this hearing is going. I am looking at the report. I will tell you that I let one slide on a Nyquil defense a couple of weeks ago. Actually, it was a Vicks 44, when the reading was a .01. *The assertion here is .05 to .07. This one isn't going to slide on a Nyquil defense, if that is the defense. I am just warning you.*

The Court added:

I don't know what the evidence is going to be. *I just told you, I saw the report, though, I am alerting you, I am educating you, that I drank Nyquil isn't going to cut it, if there is also credible evidence that the reading was above .05, or for that matter, above .03.*

(Emphasis added).

The court's statements clearly show that it attached significance to the PBT. Indeed, had the PBT result been lower, the court might have let "slide" the asserted Nyquil defense. Because the court considered the results of the PBT, and obviously regarded the test results as significant in determining whether appellant had violated the work release conditions, we cannot say the error was harmless. Therefore, we shall reverse the court's disposition.

**SENTENCE MODIFICATION VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR CHARLES COUNTY FOR FURTHER PROCEEDINGS.**

**COSTS TO BE PAID BY CHARLES COUNTY.**